1
 2024 CO 71 Parker Water and Sanitation District, a Colorado special district, Applicant-Appellant: and Meridian Metropolitan District, Arapahoe County Water and Wastewater Authority, East Cherry Creek Valley Water and Sanitation District, Rangeview Metropolitan District, Town of Castle Rock, Cherry Creek Project Water Authority, and South Metro Water Supply Authority, Intervenors-Appellants: v. Kevin G. Rein, in his official capacities as the State Engineer for the State of Colorado and Director of the Colorado Division of Water Resources; Colorado Division of Water Resources; and Corey DeAngelis, in his official capacity as the Division Engineer for Division 1; Appellees: and City of Aurora and City of Greeley, Intervenors-Appellees: No. 23SA141
Supreme Court of Colorado, En Banc
November 4, 2024
 
           Appeal
 from the District Court District Court, Water Division 1,
 Case No. 21CW3046 Honorable Todd L. Taylor, Water Judge
 
 2
 
          
 Attorneys for Applicant-Appellant: Hoffmann, Parker, Wilson
 & Carberry, P.C. Jefferson H. Parker M. Patrick Wilson
 Kathryn M. Sellars Daniel P. Harvey Denver, Colorado
 
 
          
 Attorneys for Intervenor-Appellant Meridian Metropolitan
 District: Carlson, Hammond & Paddock, LLC Mason Hamill
 Brown Denver, Colorado
 
 
          
 Attorneys for Intervenor-Appellant Rangeview Metropolitan
 District: Hayes Poznanovic Korver LLC Eric K. Trout Denver,
 Colorado
 
 
          
 Attorneys for Intervenors-Appellants Town of Castle Rock and
 South Metro Water Supply Authority: Lyons Gaddis, PC Madoline
 Wallace-Gross Longmont, Colorado
 
 
          
 Attorneys for Appellees: Philip J. Weiser, Attorney General
 Christopher R. Stork, Senior Assistant Attorney General
 Denver, Colorado
 
 
          
 Attorneys for Intervenor-Appellee City of Aurora: Hamre,
 Rodriguez, Ostrander & Dingess, P.C. Austin Hamre Teri L.
 Petitt Englewood, Colorado
 
 3
 
          
 Attorneys for Intervenor-Appellee City of Greeley: Welborn
 Sullivan Meck & Tooley, P.C. Carolyn F. Burr James M.
 Noble Denver, Colorado
 
 
           No
 appearance on behalf of: Arapahoe County Water and Wastewater
 Authority, Cherry Creek Project Water Authority, and East
 Cherry Creek Valley Water and Sanitation District.
 
 
          
 Justice Berkenkotter delivered the Opinion of the Court, in
 which Chief Justice Márquez, Justice Hood, Justice
 Gabriel, Justice Hart, and Justice Samour joined. Justice
 Boatright dissented.
 
 
          
 OPINION
 
 
          
 BERKENKOTTER, JUSTICE
 
 4
 
          ¶1
 This case concerns the State Engineer's authority to
 limit the total volume of nontributary groundwater that may
 be withdrawn from the Denver Basin aquifers over the lifetime
 of a well permit. Appellant Parker Water and Sanitation
 District ("Parker"), a quasi-municipal special
 district, applied for six permits to construct wells to
 withdraw nontributary groundwater from the aquifers
 underlying the land within Parker's boundaries, pursuant
 to multiple water decrees stretching back decades. The State
 Engineer approved Parker's applications and issued the
 permits. All six of the permits included an allowed average
 annual withdrawal-i.e., a maximum rate at which Parker is
 permitted to withdraw water from the aquifers each year-as
 required by Colorado statute. But five of the six permits
 also included, for the first time, an explicit condition
 limiting the total volume of groundwater Parker could
 withdraw from the aquifers over the life of the well permits.
 
 
          ¶2
 In response, Parker filed suit in Water Division One, arguing
 that the State Engineer lacks the authority to impose a total
 volumetric limit on the amount of nontributary groundwater
 available for withdrawal pursuant to a Denver Basin well
 permit. The State Engineer counterclaimed, asserting that
 section 37-90-137, C.R.S. (2024), and the Statewide
 Nontributary Ground Water Rules, Div. of Water Res., 2 Colo.
 Code Regs. 402-7 (2024) ("the Rules")-the statute
 and regulation that
 
 5
 
 primarily govern the use and allocation of the groundwater at
 issue -unambiguously set forth a total volumetric limit on
 the amount of nontributary Denver Basin groundwater a
 permittee may withdraw. The water court found in favor of the
 State Engineer on all issues. This appeal
 followed.[1]
 
 6
 
          ¶3
 We now conclude that, under the plain language of section
 37-90-137 and the Rules, any well permit issued for the
 withdrawal of nontributary groundwater from the Denver Basin
 aquifers necessarily imposes a total volumetric limit on the
 amount of water that may be withdrawn, whether expressly
 stated or not, unless an underlying water court decree
 determining a right to use that water explicitly provides
 otherwise. This total volumetric limit is equal to the
 quantity of nontributary groundwater underlying the land
 owned by the applicant as determined by the State Engineer at
 the time the well permit is issued, absent any statutorily
 authorized adjustments. Pumping beyond this limit would allow
 a permittee like Parker to take nontributary groundwater that
 belongs to other permittees, all of whom also have a vested
 right to use the nontributary
 
 7
 
 groundwater underlying their land in the amounts determined
 by the State Engineer at the time their permits were issued.
 
 
          ¶4
 Because the relevant statutory provisions and regulations
 unambiguously requires such a volumetric limit, the water
 court correctly concluded that the State Engineer has the
 authority to expressly include that limit in well permits.
 Therefore, for the reasons explained below, we reject
 Parker's remaining contentions.
 
 
          I.
 Background
 
 
          ¶5
 This case requires us to decide whether the State Engineer
 has the authority to limit the total amount of nontributary
 groundwater a permittee may withdraw from the Denver Basin
 aquifers over the lifetime of a well permit. Understanding
 the nature of this dispute-and the significance of the rights
 at stake-requires a crash course in both hydrogeology and the
 evolution of groundwater regulation in the State of Colorado.
 We begin with the basics.
 
 
          A.
 Nontributary Denver Basin Groundwater
 
 
          ¶6
 Groundwater is water below the surface of the earth that
 occupies empty spaces in rocks, soil, and sand. Colo.
 Ground Water Comm'n v. N. Kiowa-Bijou Groundwater Mgmt.
 Dist., 77 P.3d 62, 69 (Colo. 2003). This water is in
 constant, albeit slow, motion: Once water permeates the soil,
 gravity and pressure draw it both downward and sideways
 through small spaces between rocks and sediment.
 
 8
 
 Peter E. Barkmann et al., ON-010 Colorado Groundwater
 Atlas, Colo. Geological Surv. 02.01-02.02 (2020),
 https://coloradogeologicalsurvey.org/water/colorado-groundwater-atlas/
 [https://perma.cc/XX9E-FCEP]. A significant portion of
 Colorado's groundwater exists in aquifers, underground
 layers of saturated rock and sediment through which
 groundwater flows. N. Kiowa-Bijou, 77 P.3d at 69.
 These aquifers essentially act as reservoirs from which water
 may be mined via wells and put to beneficial use. Barkmann,
 supra, at 02.01. Put simply, the drilling of a well
 creates a hole in the aquifer. Id. at 02.05. Because
 water flows from areas of high pressure to low pressure,
 water stored in the aquifer-under pressure from the
 surrounding rock and sediment-flows toward that empty space,
 where it is pulled by gravity into the hole, and pumped to
 the surface. Id.
 
 
          ¶7
 Given the state's arid climate and population growth, it
 would be difficult to overstate the importance of groundwater
 to Coloradans today. Id. at 01.01-01.02. According
 to the Colorado Geological Survey, there are currently more
 than 285,000 groundwater wells throughout the state and
 approximately 18% of the state's water needs are
 fulfilled by groundwater resources. Id. at 01.01,
 01.03. In recognition of the importance of this resource, the
 legislature has, over time, created a comprehensive
 regulatory scheme for its management.
 
 
          ¶8
 All of Colorado's groundwater is classified and regulated
 based on its physical location and relationship with surface
 waters. Groundwater is tributary
 
 9
 
 if it is "hydraulically connected to the surface waters
 of a stream." N. Kiowa-Bijou, 77 P.3d at 70;
 see also § 37-90-103(10.5), C.R.S. (2024).
 Because of this connection, withdrawal of tributary
 groundwater may have the effect of depleting available
 surface water. N. Kiowa-Bijou, 77 P.3d at 71. Thus,
 rights to use tributary groundwater, like surface water, are
 determined by the state's water courts and administered
 by the State Engineer under the constitutional doctrine of
 prior appropriation. Id.
 
 
          ¶9
 Nontributary groundwater, on the other hand, is "either
 not hydrologically connected or is minimally connected to any
 surface stream." Water Rts. of Park Cnty.
 Sportsmen's Ranch LLP v. Bargas, 986 P.2d 262,
 265-66 (Colo. 1999), as modified on denial of
 reh'g (Oct. 4, 1999). This water is not subject to
 the doctrine of prior appropriation; rather, the General
 Assembly exercises plenary authority over nontributary
 groundwater and is empowered to administer and allocate the
 water as it sees fit. Id. at 266-67.
 
 
          ¶10
 This appeal specifically concerns nontributary groundwater
 within the Denver Basin, "a large kidney-shaped region
 measuring approximately 6,700 square miles in area with
 approximate boundaries stretching from Greeley on the north,
 Colorado Springs on the south, the front-range hogback on the
 west, and Limon on the east." N. Kiowa-Bijou,
 77 P.3d at 72. The Denver Basin consists of four bedrock
 aquifers: Dawson, Denver, Arapahoe, and Laramie-Fox Hills.
 Id.
 
 10
 
 These aquifers are stacked upon one another and are separated
 by impermeable, confining layers. Id. Water
 contained in bedrock aquifers, including those that make up
 the Denver Basin, "represents] a tremendous volume when
 taken in the aggregate." Id. at 69. Estimates
 have placed the total volume of recoverable water in the
 Denver Basin aquifers as high as 292 million
 acre-feet,[2] some 1,200 times the volume of water
 contained in Dillon Reservoir. Id. at 72 n.18.
 
 
          (Image
 Omitted)
 
 
          Figure
 1 depicts a cross-section of the formations containing the
 Denver Basin aquifers. The Denver Basin cross-sections shown
 in this figure, from top to bottom, are the Dawson Formation,
 Denver Formation, Arapahoe Formation, Laramie Formation, and
 Fox Hills Sandstone. The figure is reproduced from the
 Colorado Division of Water Resources and the Colorado
 Geological Survey Special Publication 53.
 
 
          ¶11
 Like all surface and groundwater in Colorado, "Denver
 Basin aquifer water is a public resource," Chatfield
 E. Well Co. v. Chatfield E. Prop. Owners Ass'n, 956
 P.2d 1260, 1264 (Colo. 1998), and any groundwater right is a
 use right, not "an absolute
 
 11
 
 right to ownership of water underneath [the] land,"
 id. at 1268 (citing Bayou Land Co. v.
 Talley, 924 P.2d 136, 146-47 (Colo. 1996)). Because of
 its unique characteristics and significant economic
 importance, however, Denver Basin aquifer water is classified
 and managed separately from the rest of the state's
 groundwater. Id. at 1270. Owing to the region's
 geology, groundwater in the Denver Basin aquifers is only
 directly recharged by precipitation where there are
 outcroppings along the basin edges. U.S. Geological Surv.,
 Groundwater Availability of the Denver Basin Aquifer
 System, Colorado viii (Suzanne S. Paschke ed., 2011),
 https://pubs.usgs.gov/pp/1770/ [https://perma.cc/2WBP-KCUM].
 Thus, while "[t]ributary waters are not subject to
 eventual depletion because they are annually
 replenished" by precipitation, State v. Sw. Colo.
 Water Conservation Dist., 671 P.2d 1294, 1313 (Colo.
 1983), the same is not true of Denver Basin aquifer water.
 Indeed, well pumping of Denver Basin aquifer water has long
 exceeded recharge,[3] resulting in a so-called "mining
 condition" that will eventually drain the Basin of
 recoverable water. Id.; see also N.
 Kiowa-Bijou, 77 P.3d at 72 n.18
 
 12
 
 (observing that pumping from the Denver Basin aquifers
 exceeds recharge in the Basin). Because it is not readily
 replenished and is instead subject to depletion over time,
 "there is a need to conserve this finite resource to
 offset the mining of the aquifers caused by pumping that may
 reduce discharge [to surface streams] and deplete water
 storage." N. Kiowa-Bijou, 77 P.3d at 80. The
 total amount of nontributary groundwater in the Denver Basin
 is further limited given the estimate that roughly 50% of the
 groundwater in the Basin is not recoverable. M.W. Bittinger,
 The Denver Basin: Its Bedrock Aquifers 3 (1978). For
 all these reasons, Denver Basin groundwater is recognized by
 Colorado law as a nonrenewable, exhaustible resource.
 Chatfield, 956 P.2d at 1265.[4]
 
 
          ¶12
 The Colorado Groundwater Management Act, sections 37-90-101
 to -143, C.R.S. (2024), governs Denver Basin groundwater.
 Unlike groundwater in the rest of the state, the Act
 categorized Denver Basin aquifer water as either nontributary
 or not nontributary.[5] Each category is subject to different
 regulations. See
 
 13
 
 §§ 37-90-103(10.5), (10.7), -137(4). Denver Basin
 aquifer water is nontributary if its withdrawal "will
 not, within one hundred years of continuous withdrawal,
 deplete the flow of a natural stream ... at an annual rate
 greater than one-tenth of one percent of the annual rate of
 withdrawal." § 37-90-103(10.5). Denver Basin
 groundwater is not nontributary[6] if it is hydrologically connected
 to a surface stream such that its withdrawal will
 "deplete the flow of a natural stream" at a rate
 greater than that. § 37-90-103(10.7).
 
 
          ¶13
 The General Assembly exercises plenary authority over
 nontributary Denver Basin aquifer water and is empowered to
 administer and allocate the water
 
 14
 
 as it sees fit. Bargas, 986 P.2d at 266. The
 regulatory scheme imposed by the General Assembly through a
 series of enactments over a half-century reflect the General
 Assembly's attempt to strike a delicate balance between
 "two primary concerns": "diminishment of the
 historically available supply of the South Platte River
 system through well pumping" and the "'great
 economic importance'" of Denver Basin groundwater to
 overlying landowners. Chatfield, 956 P.2d at 1270
 (quoting § 37-90-103(10.5)). We turn now to discuss that
 regulatory scheme.
 
 
          B.
 Administration and Allocation of Nontributary Denver Basin
 Groundwater
 
 
          ¶14
 As part of its plenary authority over water resources in
 Colorado, the General Assembly is entrusted with implementing
 laws related to nontributary groundwater. Sw. Colo. Water
 Conservation Dist., 671 P.2d at 1307. Colorado law
 governing nontributary groundwater "has developed more
 slowly than that with respect to tributary water."
 Id. at 1311. Prior to 1965, the General Assembly
 "acted only sparingly" with regard to groundwater
 regulation and made no distinction between tributary and
 nontributary groundwater. Id. at 1311-12. Motivated,
 however, by the "need to ration use of essentially
 non-renewable ground water in the high plains region,"
 the legislature enacted the Colorado Ground Water Management
 Act in 1965 ("1965 Act"). Upper Black Squirrel
 Creek Ground Water Mgmt. Dist. v. Goss, 993 P.2d 1177,
 1182 (Colo. 2000).
 
 15
 
          ¶15
 The 1965 Act recognized that "[u]nderground water basins
 require management that is different from the management of
 surface streams and underground waters tributary to such
 streams." Fundingsland v. Colo. Ground Water
 Comm'n, 468 P.2d 835, 839 (Colo. 1970). This is
 because nontributary groundwater "is not subject to the
 same ready replenishment enjoyed by surface streams and
 tributary ground water" and may be withdrawn at "a
 rate in excess of the annual recharge creating what is called
 a mining condition." Id. Thus, "[u]nless
 the rate of pumping is regulated, mining [of nontributary
 groundwater] must ultimately result in lowering the water
 balance below a level from which water may be economically
 withdrawn." Id.
 
 
          ¶16
 The 1965 Act required a party wishing to drill a new well or
 expand the production of an existing well to first obtain a
 permit from the State Engineer. § 148-18-36(1), C.R.S.
 (1963 &1965 Supp.) ("From and after [May 17, 1965],
 no new wells shall be constructed outside the boundaries of a
 designated ground water basin, nor the supply of water from
 existing wells outside the boundaries of a designated ground
 water basin increased or extended, unless the user shall make
 an application in writing to the state engineer for a
 'permit to construct a well ....'"). This new
 statutory scheme authorized the State Engineer to issue well
 permits for the construction of all wells in the state,
 including (though not explicitly) wells to withdraw
 nontributary groundwater. Ch. 319, sec. 1,
 
 16
 
 § 148-18-37(1), 1965 Colo. Sess. Laws 1246, 1266-67. It
 did not consider ownership of the overlying land in
 determining the amount of nontributary groundwater a
 potential permittee could withdraw. Bayou Land Co.,
 924 P.2d at 147.
 
 
          ¶17
 In 1973, responding to concerns about the potential depletion
 of nontributary groundwater resources throughout the state,
 the General Assembly enacted Senate Bill 213. William
 Fronczak, Designated Ground Water: Colorado's Unique
 Way of Administering Its Underground Resources, 7 U.
 Denv. Water L. Rev. 111, 123 (2003). The first legislative
 enactment to expressly regulate nontributary groundwater,
 Senate Bill 213, amended section 148-18-36 - later
 re-codified at section 37-90-137(5) -to limit nontributary
 groundwater withdrawals to "only that quantity of water
 underlying the land owned by the applicant" and
 established a "sip slowly" rationing provision
 intended to ensure a "minimum useful life of the aquifer
 [of] one hundred years." Ch. 441, sec. 1, §
 148-18-36(5), 1973 Colo. Sess. Laws 1520, 1520.[7] Put another way,
 through Senate Bill 213, the legislature conditioned the
 right to withdraw nontributary groundwater "upon
 
 17
 
 overlying land ownership . . . with available quantity
 determined by a 100 year aquifer life expectancy."
 Bargas, 986 P.2d at 266.
 
 
          ¶18
 In 1985, the General Assembly statutorily defined
 nontributary groundwater for the first time through the
 enactment of Senate Bill 5, see Ch. 285, sec. 2,
 § 37-90-103(10.5), 1985 Colo. Sess. Laws 1160, 1161, and
 set out a comprehensive regulatory scheme for its allocation
 and administration, id. at 1160-69; N.
 Kiowa-Bijou, 77 P.3d at 71 n.13. While largely retaining
 the language of Senate Bill 213, the legislature also
 authorized the State Engineer to promulgate rules and
 regulations for the administration of nontributary
 groundwater and the standardization of well permitting,
 see § 37-90-137(9)(a), and, at the same time,
 subjected Denver Basin groundwater to the new water use
 system laid out in section 37-90-137(4), Chatfield,
 956 P.2d at 1270. Senate Bill 5 amended section 37-90-137(4)
 "to define the legal standards for issuing well permits
 and decrees for the use of Denver Basin aquifer water"
 and established specific criteria for use by the State
 Engineer in determining whether to issue a well permit for
 the withdrawal of nontributary groundwater.
 Chatfield, 956 P.2d at 1269; see also Sw. Colo.
 Water Conservation Dist., 671 P.2d at 1314.
 
 
          ¶19
 The legislature, recognizing the "unique, finite nature
 of nontributary ground water resources," declared that
 "such nontributary ground water shall be devoted to
 beneficial use in amounts based upon conservation of the
 resource and
 
 18
 
 protection of vested water rights" and that "the
 development of nontributary ground water resources consonant
 with conservation shall be the policy of this state."
 Ch. 285, sec. 1, §37-90-102(2), 1985 Colo. Sess. Laws
 1160, 1160-61. Acknowledging that the regulatory framework
 enacted through Senate Bill 5 was based upon "the best
 available evidence at this time," the General Assembly
 further declared that such water "shall be allocated . .
 . upon the basis of ownership of the overlying land."
 Id. Thus, the "legislature's enactment of
 Senate Bill 5 confirmed and clarified the connection between
 ownership of land and nontributary ground water rights, which
 was first announced in Senate Bill 213." Bayou Land
 Co., 924 P.2d at 148. Further, these enactments
 "created an inchoate right to control and use a
 specified amount of nontributary ground water in owners of
 the overlying land." Id. at 149.
 
 
          ¶20
 In 1986, pursuant to its newly delegated authority, the State
 Engineer promulgated the Statewide Nontributary Ground Water
 Rules, a comprehensive set of rules related to the
 nontributary groundwater provisions in section 37-90-137.
 See Div. of Water Res., 2 Colo. Code Regs. 402-7
 (2024). Rule 8(B) provides that "[t]he total amount of
 water recoverable from a specific aquifer from a well or
 wells shall be determined by multiplying the number of acres
 of overlying land . . . by the average number of feet of
 saturated aquifer materials in the aquifer underlying those
 lands by the average specific yield of
 
 19
 
 those saturated aquifer materials." Div. of Water Res.,
 2 Colo. Code Regs. 402-7:8(B) (2024). This total is then used
 to calculate the average annual amount of withdrawal, which
 "shall be 1% of the total recoverable water."
 Id. Rule 8(A) echoes Rule 8(B) and section
 37-90-137(4). It bases the allowed average annual withdrawal
 on an aquifer life of one hundred years and states that
 "[t]he allowed average annual amount of withdrawal for
 all of the wells on the overlying land shall not exceed one
 percent of the total amount of water, exclusive of artificial
 recharge, recoverable from a specific aquifer beneath the
 overlying land." Div. of Water Res., 2 Colo. Code Regs.
 402-7:8(A) (2024).
 
 
          ¶21
 A landowner's inchoate right to use nontributary Denver
 Basin groundwater vests once they construct a well in
 accordance with a well permit issued by the State Engineer.
 N. Kiowa-Bijou, 77 P.3d at 71. Alternatively, a
 landowner can seek a decree from the water court determining
 their right to withdraw nontributary Denver Basin
 groundwater. Id. Like the State Engineer's
 issuance of a well permit, the water court's
 determination of a groundwater right is governed by the
 statutory scheme allocating groundwater on the basis of land
 ownership. Id. Under section 37-92-203(1), C.R.S.
 (2024), of the Water Right Determination and Administration
 Act of 1969, the water court is authorized to determine the
 amount of nontributary Denver Basin groundwater an overlying
 landowner is entitled to withdraw. N. Kiowa-Bijou,
 77 P.3d at 75. And, like
 
 20
 
 construction of a permitted well, "[s]uch an
 adjudication by the water court creates a vested water use
 property right in the overlying landowner." Id.
 at 71.
 
 
          ¶22
 Whether a use right is established by a well permit or by a
 decree of the water court, a landowner must obtain a permit
 from the State Engineer before they can construct a well to
 withdraw nontributary groundwater. See §
 37-90-137(1)(a), (4). And, in any event, withdrawals are
 subject to the conditions and standards set forth in section
 37-90-137 and the Rules. N. Kiowa-Bijou, 77 P.3d at
 72. Taken together, the statutory provisions and the Rules
 establish that: (1) withdrawals are based on an expected
 aquifer life of one hundred years; (2) the allowed average
 amount of withdrawal, exclusive of artificial recharge,
 cannot exceed one percent of the total amount of water
 recoverable from the portion of the aquifer underlying the
 land; (3) the allowed amount of withdrawal under a permit and
 decree shall be the same; and (4) a reduction in either
 hydrostatic pressure or water level in the aquifer caused by
 withdrawals shall not result in a material injury to vested
 nontributary groundwater rights. Id.
 
 
          ¶23
 It is against this regulatory backdrop that we turn to the
 facts and history of this case.
 
 
          II.
 Facts and Procedural History
 
 
          ¶24
 Parker is a quasi-municipal Colorado special district that
 supplies water to residents and businesses within its
 boundaries for domestic and other public and
 
 21
 
 private purposes.[8] In 2018, the most recent year for which an
 estimate is available, Parker supplied water to approximately
 53,000 Coloradans. The majority of Parker's annual water
 supply is produced by deep wells withdrawing water from the
 Denver Basin aquifers. In 2020, Parker's thirty-three
 Denver Basin wells produced some 9,500 acre-feet of water -
 constituting more than half its total water supply that year.
 
 
          A.
 Parker's Well Permits and Decreed Rights to Nontributary
 Groundwater
 
 
          ¶25
 Since Parker's inception in 1962, the water court has
 issued several decrees vesting Parker's rights to use
 nontributary groundwater contained in the Denver Basin
 aquifers. Beginning in 1981, pursuant to its decreed rights,
 Parker sought and was issued numerous well permits allowing
 it to withdraw nontributary
 
 22
 
 groundwater from the Denver Basin aquifers. Each of these
 permits contained an allowed annual average withdrawal-i.e.,
 a maximum annual rate at which Parker could withdraw water
 from the well. None of its permits explicitly imposed a total
 volumetric limit on the amount of groundwater it could
 withdraw pursuant to the permit.
 
 
          ¶26
 In January 2021, Parker applied for six new well permits
 pursuant to section 37-90-137(4) that would allow it to
 withdraw nontributary groundwater from the Denver Basin
 aquifers in accordance with its decreed groundwater rights.
 The State Engineer approved the applications and issued all
 six permits. Consistent with its earlier permits, each of
 Parker's new permits contained an allowed annual average
 withdrawal. But as noted, five of the six permits, unlike
 those issued previously, contained an explicit total
 volumetric limit on the amount of water available for
 withdrawal. It is those total volumetric limits that are the
 subject of the case now before us.
 
 
          B.
 Proceedings in the Water Court
 
 
          ¶27
 Parker filed a complaint in Water Division One under section
 24-4-106, C.R.S. (2024), of the State Administrative
 Procedure Act, asserting that the State Engineer lacked the
 authority to include a total volumetric limit in a well
 permit. In Parker's view, the State Engineer's
 inclusion of the limit was arbitrary and capricious, an abuse
 of discretion, and contrary to law. Parker asserted in its
 
 23
 
 amended complaint that the limit violated its statutory and
 constitutional rights, as well as its vested groundwater
 rights, as established by existing decrees of the water
 court. Parker asked the water court to declare the total
 volumetric limit unlawful, to enjoin enforcement of the
 condition, and to order the State Engineer to reissue the
 permits without the total volumetric limit.
 
 
          ¶28
 Shortly thereafter, the City of Aurora ("Aurora")
 and the City of Greeley ("Greeley") sought leave to
 intervene. Aurora argued that a decision favoring Parker
 could harm Aurora's vested nontributary and not
 nontributary groundwater rights given that its service area
 was within a half-mile of Parker's service area. Greeley
 emphasized that it disagreed with Parker's position and
 asserted that a decision in Parker's favor would impact
 other nontributary groundwater decrees and permits in other
 regions across Colorado because the statute applies to
 nontributary groundwater throughout the state. The court
 granted both motions to intervene.
 
 
          ¶29
 The State Engineer answered Parker's complaint and
 asserted a counterclaim for declaratory relief, arguing that
 section 37-90-137(4) and Rule 8(B) describe and provide for a
 total cap on the amount of groundwater available for
 withdrawal pursuant to a well permit. Thus, the State
 Engineer, who administers and allocates nontributary
 groundwater throughout the state, sought a declaration
 
 24
 
 that he acted within his statutory authority in including an
 explicit total volumetric limit in Parker's well permits.
 
 
          ¶30
 After Parker served written discovery on the State Engineer,
 the State Engineer moved to stay discovery, asserting that no
 factual discovery was necessary because it intended to seek
 only a determination as to whether the plain language of the
 statute and Rules sets forth and requires a total volumetric
 limit on groundwater withdrawals. The water court granted the
 State Engineer's motion and stayed all discovery pending
 its ruling on the State Engineer's counterclaim
 ("2021 Order"). The State Engineer then moved for a
 determination of two questions of law pursuant to C.R.C.P.
 56(h): (1) whether the plain language of section 37-90-137(4)
 provides for a total volumetric limit applicable to well
 permits authorizing withdrawal of nontributary and Denver
 Basin groundwater and (2) whether the Rules likewise set
 forth a total volumetric limit.
 
 
          ¶31
 Parker responded with a cross-motion for determination of
 three questions of law, contending that (1) section 37-90-137
 unambiguously does not provide for, contemplate, or allow a
 total volumetric limit to be imposed on groundwater well
 permits; (2) the Rules likewise do not provide for,
 contemplate, or allow such a limit; and (3) the State
 Engineer lacked the authority to impose a total volumetric
 limit or to promulgate rules and regulations providing for
 such a limit.
 
 25
 
          ¶32
 In a June 2022 order ("2022 Order"), the water
 court found in favor of the State Engineer on all issues,
 first determining that section 37-90-137 unambiguously sets
 forth a total volumetric limit on groundwater withdrawals
 pursuant to a well permit. The court began its analysis with
 section 37-90-137(4)(b)(II)'s provision limiting
 withdrawals to "that quantity of water, exclusive of
 artificial recharge, underlying the land owned by the
 applicant." This statutory language unambiguously refers
 to a volumetric limit, the court concluded. "By
 definition, a quantity of water is a volumetric
 limit," it explained, noting that "[f]or purposes
 of water engineering, volume is defined as a
 'specific quantity of water generally expressed in terms
 of acre-feet.'" (Quoting Leonard Rice &Michael
 D. White, Engineering Aspects of Water Law 179
 (1991).) Thus, the water court determined that the total
 quantity limitation was both expressly stated in the statute
 and plainly understood to be the quantity of nontributary
 groundwater underlying the land owned by the applicant.
 
 
          ¶33
 The water court then rejected Parker's argument that the
 statute authorizes only an average annual rate of withdrawal
 without a total volumetric limit. That position is illogical,
 the court explained, because under section
 37-90-137(4)(b)(I), the average annual rate of withdrawal is
 limited to a maximum of one one-hundredth-or, said
 differently, one percent-of the total amount of water
 underlying the applicant's land. "Even if the State
 Engineer was authorized to set
 
 26
 
 only an annual average rate of withdrawal," the court
 continued, "the math to determine the total volumetric
 limit would be simple: the average annual rate of withdrawal
 multiplied by 100 years equals the total amount of
 groundwater that can be withdrawn over the life of a well
 permit." Thus, the court concluded that the express
 volumetric limit represented the total amount of groundwater
 underlying the applicant's land and is simply a different
 way of mathematically expressing the annualized rate limit of
 one percent of that quantity of water multiplied by the
 100-year life of the aquifer.
 
 
          ¶34
 Having determined that section 37-90-137 unambiguously sets
 forth a volumetric limit, the court turned to whether the
 State Engineer was authorized to include such a limit in a
 well permit. Because the State Engineer is obligated by
 statute "to ensure that no more water is withdrawn from
 an aquifer than what is physically available under the
 applicant's land," the court wrote, it follows that
 the State Engineer is empowered "to determine this total
 volumetric limit in order to enforce it." Thus, the
 court concluded that the State Engineer acted within the
 bounds of his statutory authority by including a total
 volumetric limit equal to the quantity of nontributary
 groundwater the State Engineer determined was physically
 available under the applicant's land at the time the
 permit was issued.
 
 
          ¶35
 The court likewise determined that Rule 8(B), consistent with
 section 37-90-137(4), unambiguously provides for a total
 volumetric limit. In the
 
 27
 
 court's view, Rule 8(B)'s provision stating that the
 "allowed average annual amount of withdrawal shall be 1%
 of the total recoverable water," Div. of Water Res., 2
 Colo. Code Regs. 402-7:8(B) (2024), explicitly imposes a
 total volumetric limit on nontributary groundwater
 withdrawals from Denver Basin aquifers over the lifetime of a
 well permit equal to the quantity of nontributary groundwater
 the State Engineer determined was physically available under
 the applicant's land at the time the permit was issued.
 
 
          ¶36
 Following this analysis, the court granted the State
 Engineer's motion and denied Parker's cross-motion.
 
 
          ¶37
 The State Engineer then sought resolution of the remaining
 issues raised by its counterclaim through a second motion for
 determination of questions of law. This time, the State
 Engineer asked the court to determine whether (1) the State
 Engineer has the administrative authority to issue well
 permits including a total volumetric limit, even if any
 applicable water court decree does not specifically state
 that limit; (2) a total volumetric limit must be expressly
 stated in a well permit or decree to be enforceable; and (3)
 such a limit also applies to well permits and decrees issued
 under the prior version of the statute, Senate Bill 213
 (effective July 6, 1973), before it was amended by Senate
 Bill 5 (effective July 1, 1985), even if those decrees and
 well permits do not expressly include a total volumetric
 limit.
 
 28
 
          ¶38
 On March 2, 2023, the water court again ruled in favor of the
 State Engineer on all issues ("2023 Order"). The
 water court rejected Parker's contention that it has the
 right to withdraw nontributary Denver Basin groundwater at
 the stated maximum annual rate of withdrawal indefinitely if
 the decree adjudicating its groundwater right did not
 explicitly impose a total volumetric limit because
 "[t]his contention contradicts long-standing principles
 of Colorado water law." In the court's view, the
 General Assembly made clear when it enacted Senate Bill 213
 in 1973 that "only that quantity of water underlying the
 land owned by the applicant . . . is considered to be
 unappropriated" (quoting § 37-90-137(4), C.R.S.
 (1973)). Thus, the water court concluded that the plain
 language of the 1973 statute-under which some of Parker's
 water decrees and well permits were issued-unambiguously
 provided for a total volumetric limitation on withdrawals of
 nontributary groundwater from Denver Basin wells and that the
 volumetric limitation is equal to the quantity the State
 Engineer determined was physically available under the
 applicant's land at the time the permit was issued.
 
 
          ¶39
 "Colorado law has recognized for at least the past 50
 years that nontributary groundwater is a finite resource that
 must be responsibly managed and conserved to prolong its
 longevity," the court continued. Thus, it concluded that
 Parker's decrees "do not grant them the right to
 unlimited pumping of nontributary groundwater." Rather,
 the court determined that, consistent with the finite nature
 
 29
 
 of nontributary groundwater, the decrees both implicitly and
 explicitly limit the total amount of water available for
 withdrawal to only that water underlying the land identified
 in the decree. That total amount available for withdrawal,
 the court explained, is the same total the State Engineer
 determined in order to calculate the allowed annual average
 amount of withdrawal.
 
 
          ¶40
 The water court then certified the 2021, 2022, and 2023
 Orders as final. This appeal followed.
 
 
          III.
 Analysis
 
 
          ¶41
 We begin by laying out our well-established principles of
 statutory construction and the standards of review applicable
 to this case. We then address each of the issues that Parker
 raised.
 
 
          A.
 Principles of Statutory Construction and Applicable Standards
 of Review
 
 
          ¶42
 This case turns on the meaning of several statutory
 provisions and administrative regulations. Statutory
 interpretation is a question of law that we review de novo.
 Dep't of Nat. Res. v. 5 Star Feedlot, Inc., 2021
 CO 27, ¶ 20, 486 P.3d 250, 256. Our goal is to ascertain
 the intent of the General Assembly and "adopt the
 statutory construction that best effectuates the purposes of
 the legislative scheme." Bargas, 986 P.2d at
 268 (quoting M.S. v. People in Int. of L.R.S., 812
 P.2d 632, 635 (Colo. 1991)). We look to the statutory scheme
 as a whole "to give consistent, harmonious, and sensible
 effect to all its parts." 5 Star Feedlot, Inc.,
 ¶ 20, 486 P.3d at 256.
 
 30
 
 We read words and phrases in context and construe them
 according to their plain and ordinary meanings.
 Bargas, 986 P.2d at 268. "Words and phrases
 that have acquired a technical or particular meaning whether
 by legislative definition or otherwise," however,
 "shall be construed accordingly." § 2-4-101,
 C.R.S. (2024).
 
 
          ¶43
 If the language of a statute is unambiguous-i.e., it is not
 susceptible to multiple reasonable interpretations-our job is
 done, and we need look no further. Bargas, 986 P.2d
 at 268. But if the statutory language is ambiguous, we may
 consider other tools of statutory construction, including the
 consequences of a given construction, the purpose of the
 statute, and legislative history. Id. "We
 presume throughout that the General Assembly intended a just
 and reasonable result and that it favored the public interest
 over any private interest." Id. We avoid
 statutory constructions that would lead to illogical or
 absurd results. 5 Star Feedlot, Inc., ¶ 20, 486
 P.3d at 256.
 
 
          ¶44
 We apply these same rules of statutory construction to the
 interpretation of administrative regulations. Educhildren
 LLC v. Cnty. of Douglas Bd. of Equalization, 2023 CO 29,
 ¶ 28, 531 P.3d 986, 993. "While we may afford
 deference to an agency's reasonable interpretation of a
 statute that it is charged with administering, we are not
 bound by it." Id.
 
 31
 
          ¶45
 Lastly, we review a court's order on discovery for abuse
 of discretion. In re People in Int. of J. P., 2023
 CO 57, ¶ 17, 538 P.3d 337, 343.
 
 
          B.
 Section 37-90-137 Unambiguously Imposes a Total Volumetric
 Limit on Nontributary Groundwater Withdrawals Pursuant to a
 Well Permit
 
 
          ¶46
 The parties in this appeal specifically dispute the meaning
 of several provisions of section 37-90-137(4). These
 provisions set forth the process for determining the amount
 of groundwater underlying an applicant's land and,
 accordingly, the average annual allowed withdrawal for a
 given well.
 
 
          ¶47
 Parker contends that the water court erred in holding that
 the plain language of section 37-90-137 allows the State
 Engineer to limit the total volume of nontributary
 groundwater that may be withdrawn from Denver Basin aquifers
 over the lifetime of a well permit. In Parker's view, a
 permittee is entitled to withdraw all the tributary
 groundwater under its land in perpetuity, subject only to the
 annual rate of withdrawal. Thus, if it is still able to pump
 water from its wells two hundred years after the issuance of
 the well permits, it may lawfully do so, subject only to the
 average annual rate of withdrawal limitation. Under
 Parker's reading of the pertinent statutes, a landowner
 is not required to cease pumping its allowed annual
 allocation under a Denver Basin well permit until the supply
 of nontributary groundwater in the aquifer beneath its land
 is physically exhausted.
 
 32
 
          ¶48
 The State Engineer counters that the water court did not err
 because the statute unambiguously imposes a total volumetric
 limit. In the State Engineer's view, the water court
 correctly interpreted section 37-90-137(4)(b) to refer only
 to that quantity of water the State Engineer determines is
 underlying the land at the time the State Engineer issues the
 permit. This interpretation means a permittee withdrawing one
 percent of the total quantity of water underlying its land
 each year could only do so for one hundred years, at which
 point it would have mined the full quantity of water
 underlying its land. A permittee could, the State Engineer
 asserts, only extend the life of a well permit beyond one
 hundred years by withdrawing, on average, less than one
 percent of that water annually until they have withdrawn a
 total amount of water equal to the well's total
 volumetric cap. According to the State Engineer, a permittee
 could not, under any circumstances, exceed a well's total
 volumetric limit. As a result, once a well's total
 volumetric limit is reached, the permittee must stop
 operating the well. Pumping beyond the volumetric cap would,
 the State Engineer argues, result in the taking of
 nontributary groundwater that belongs to other permittees,
 all of whom also have a vested right to use the nontributary
 groundwater underlying their land in the amounts determined
 by the State Engineer at the time their permits were issued.
 
 33
 
          ¶49
 To address this disagreement, we look to the plain language
 of section 37-90-137(4). It provides that "the amount of
 . . . groundwater available for withdrawal shall be that
 quantity of water . . . underlying the land owned by
 the applicant," § 37-90-137(4)(b)(II) (emphasis
 added), and that well permits issued pursuant to the statute
 "shall allow withdrawals on the basis of an aquifer life
 of one hundred years." § 37-90-137(4)(b)(I). To
 settle this dispute, we must discern the plain and ordinary
 meaning of the word "quantity." Black's Law
 Dictionary defines "quantity" as "[t]he amount
 of something measurable; the ascertainable number of
 countable things." Quantity, Black's Law
 Dictionary (12th ed. 2024). Thus, the common meaning of
 "quantity" suggests that "quantity of
 water" as used in the statute refers to a measurable
 amount of water.
 
 
          ¶50
 Recall, however, that groundwater is not static but instead
 flows through the aquifer, albeit slowly. Barkmann,
 supra, at 02.01. Because groundwater moves, and
 because cumulative withdrawals of Denver Basin groundwater
 necessarily draw down the overall quantity of water within
 the basin's aquifers, the quantity of water directly
 underlying any given parcel of land is certain to change over
 time. Barkmann, supra, at 02.01. Thus, to issue a
 permit, the State Engineer must first determine "the
 amount of such groundwater available for withdrawal."
 37-90-137(4)(b)(II); see also V Bar Ranch LLC v.
 Cotten, 233 P.3d 1200, 1206 (Colo. 2010) (explaining
 that the General Assembly "vested the State Engineer
 
 34
 
 with administrative authority over the distribution of the
 surface and groundwaters of the state"). Importantly,
 this determination can only be made by calculating the amount
 of nontributary groundwater underlying the land at the time
 that the permit or decree is issued.
 
 
          ¶51
 In our view, these statutory provisions are unambiguous. When
 read together with an eye towards an interpretation that
 gives "consistent, harmonious, and sensible effect to
 all its parts," 5 Star Feedlot, Inc., ¶
 20, 486 P.3d at 256, they necessarily impose a total
 volumetric limit on withdrawals of nontributary Denver Basin
 groundwater over the lifetime of a well permit. Put simply,
 the statute provides that a landowner is entitled to that
 quantity of nontributary groundwater underlying their land,
 as determined by the State Engineer at the time the permit is
 issued.
 
 
          ¶52
 In order to effectuate the legislature's stated intent to
 ensure a useful life of the Denver Basin aquifers of at least
 100 years, each permittee is allowed to withdraw their water
 at a rate no greater than one percent of their total
 allocation. The calculation of that allowed average annual
 withdrawal-which must be expressly stated in a well
 permit-cannot be accomplished without first determining the
 quantity of water underlying the land that is available for
 withdrawal by each permittee. And, importantly, the Denver
 Basin aquifers cannot be fairly rationed and allocated among
 permittees if some are allowed to
 
 35
 
 exceed their allocation, as determined by the State Engineer,
 at the cost of other permittees. This is the argument that
 was advanced by intervenors Aurora and Greeley-both of which
 also have rights to use nontributary groundwater from the
 Denver Basin-before the water court.
 
 
          ¶53
 To be sure, Parker is correct that the statute mandates the
 inclusion of only an annual amount of withdrawal in well
 permits-an amount that is based on the concept of a 100-year
 aquifer life and which reflects a withdrawal rate rather than
 a total volumetric limit. But we reiterate that the statute
 requires the State Engineer to calculate the measurable
 quantity of tributary groundwater underlying each
 applicant's land at the time the permit is issued.
 Without this determination, the State Engineer cannot
 determine the annual rate of withdrawal. Put differently, the
 State Engineer cannot calculate an annual rate of withdrawal
 based on an undefined quantity of water that is certain to
 change over time. This calculation also cannot be fairly
 understood to include recoverable nontributary groundwater
 underlying land not owned by the permittee.
 
 
          ¶54
 In this regard, Parker's construction of the statute
 ignores the hydrogeology of the groundwater at issue. The
 impact of pumping groundwater from an aquifer ripples beyond
 the actual water that is withdrawn. Withdrawal of aquifer
 water decreases overall water levels throughout the aquifer.
 See N. Kiowa-Bijou, 77 P.3d at 80 ("[P]umping
 that exceeds recharge will eventually deplete the usable
 water
 
 36
 
 in the Denver Basin aquifers."). Importantly,
 withdrawals also result in a drop in hydrostatic pressure in
 the area surrounding the well. This creates a cone of
 depression and draws water within the well's zone of
 influence toward the well. In other words, the act of pumping
 can pull groundwater underlying a neighboring permittee's
 land toward the well. Absent a total volumetric limit, a
 permittee who continues to pump at the maximum permitted rate
 for more than 100 years would end up pulling water to its
 well that would not otherwise be underlying its land.
 
 
          ¶55
 Were we to embrace Parker's interpretation that
 permittees are entitled to withdraw at the annual rate in
 perpetuity, the result would be a race to the bottom of the
 aquifer, with earlier permittees receiving a significant head
 start. This result undermines the clear legislative intent to
 balance this economically critical resource's beneficial
 use with its conservation and the protection of vested
 groundwater rights.
 
 
          ¶56
 Three provisions of the governing statutory scheme in
 particular support our construction that well permits are
 subject to total volumetric limits. First, section
 37-90-102(2), C.R.S. (2024), mandates that nontributary
 groundwater "shall be allocated . . . upon the
 basis of ownership of the overlying land." (Emphasis
 added.) According to Black's Law Dictionary,
 "allocation" means "[t]he amount or share of
 something that has been set aside or designated for a
 particular
 
 37
 
 purpose." Allocation, Black's Law
 Dictionary (12th ed. 2024). Thus, based on the plain meaning
 of the term, nontributary groundwater that is allocated to a
 particular well permit based on overlying land ownership is
 "set aside" at the time the permit is issued.
 Noting again that groundwater is not stationary and that
 pumping of groundwater draws water toward the well, a
 construction of section 37-90-137(4) that would allow a
 permittee to continuously withdraw water beyond the quantity
 underlying their land when their permit was issued would
 essentially authorize the withdrawal of nontributary
 groundwater allocated to other permittees.
 
 
          ¶57
 Second, section 37-90-137(9)(a) imbues the State Engineer
 with the authority to "adopt rules and regulations to
 prescribe reasonable criteria and procedures" regarding
 well permits. But it limits the universe of permissible rules
 and regulations to those which "allow the withdrawal
 pursuant to such permits of the full amount of
 groundwater determined under subsection (4)."
 Id. (emphasis added). The "full amount of
 groundwater determined" by the State Engineer during the
 well permitting process is, we reiterate, necessarily a
 snapshot of the quantity underlying the land at the time the
 determination is made.
 
 
          ¶58
 Third, the annual amount of withdrawal stated in a well
 permit is subject to "subsequent adjustment . . . to
 conform to the actual aquifer characteristics encountered
 upon drilling of the well or test holes." §
 37-90-137(4)(d). This
 
 38
 
 provision reflects the legislature's recognition of the
 difficulties inherent in determining the quantity of
 groundwater underlying an applicant's land. It also
 supports our construction of the statute when taken as a
 whole.
 
 
          ¶59
 And, if upon constructing the well or drilling test holes,
 the permittee discovers that the State Engineer's
 determination of the quantity of water underlying their land
 appears to be inaccurate, under section 37-90-137(4)(d), the
 State Engineer may adjust its determination of that quantity,
 thereby adjusting the annual amount of withdrawal. Under
 Parker's interpretation, this provision would serve
 little purpose: A permittee could simply withdraw groundwater
 in accordance with the stated allowed average annual amount
 of withdrawal rate until the physical supply of groundwater
 is exhausted, without the need for such an adjustment to
 conform to the actual aquifer characteristics.
 
 
          ¶60
 We agree with the State Engineer that a permittee could
 extend the life of a well permit beyond one hundred years by
 withdrawing less than the one percent maximum rate until they
 have reached their total volumetric limit. However, once the
 total volumetric limit is reached, the permittee must stop
 operating the well because pumping beyond the volumetric cap
 would result in the taking of nontributary groundwater that
 belongs to other permittees, each of which has their own
 vested right to use one percent of the total amount of
 nontributary
 
 39
 
 groundwater underlying their land as determined by the State
 Engineer at the time their permits were issued.
 
 
          ¶61
 Finally, we note that the existence of a total volumetric
 limit has been implicitly recognized by this court in prior
 cases. In Bayou Land Co., for example, we explained
 that "the legislature has created an inchoate right to
 control and use a specified amount of nontributary
 ground water in owners of overlying land." 924 P.2d at
 149 (emphasis added). We later noted in N.
 Kiowa-Bijou that "[a] use right is a specific
 entitlement to a quantity of Denver Basin ground
 water underneath the applicant's land." 77 P.3d at
 66 (emphasis added). Our decision today is consistent with
 these earlier pronouncements.
 
 
          ¶62
 For all these reasons, we now hold that the plain language of
 section 37-90-137(4) unambiguously imposes a total volumetric
 limit on the amount of nontributary Denver Basin groundwater
 a permittee may withdraw over the lifetime of a well permit.
 The total volumetric limit is equal to that quantity of
 nontributary groundwater underlying the applicant's land
 as determined by the State Engineer. While that quantity is
 calculated at the time the permit is issued, it can be
 revised upon the presentation of new information to the State
 Engineer. We further hold that, even where not expressly
 stated, such a total volumetric limit exists by implication
 in every well permit issued pursuant to
 
 40
 
 section 37-90-137(4) and is equal to one hundred times the
 maximum annual amount of withdrawal.[9]
 
 
          C.
 Well Permits Issued Under Senate Bill 213 Are Also Subject to
 a Total Volumetric Limit
 
 
          ¶63
 Parker maintains that, even if the current version of the
 statute imposes a total volumetric limit, no such limit
 applies to its well permits issued under Senate Bill 213.
 According to Parker, the earlier version of the well
 permitting statute - enacted through Senate Bill 213 in 1973
 and in effect until the passage of
 
 41
 
 Senate Bill 5 in 1985-unambiguously did not provide for, set
 forth, or authorize a total volumetric limit on withdrawals
 of nontributary Denver Basin groundwater. We disagree.
 
 
          ¶64
 Recall that Senate Bill 213 amended the statute to add a new
 subsection, which stated, in relevant part, that:
 
 
 [I]n considering whether [a well] permit shall be issued,
 only that quantity of water underlying the land owned by
 the applicant or by the owners of the area, by their
 consent, to be served is considered to be unappropriated;
 [and] the minimum useful life of the aquifer is one hundred
 years, assuming that there is no substantial artificial
 recharge within said period ....
 
 
 § 37-90-137(4), C.R.S. (1973) (emphasis added).
 
 
          ¶65
 Looking again to the plain and ordinary meaning of the
 statutory language, we read "that quantity of water
 underlying the land owned by the applicant" to have the
 same meaning as the substantially similar language in section
 37-90-137(4)(b)(II), and we conclude that the phrase
 unambiguously refers to a measurable amount of water.
 Merriam-Webster defines "appropriate" as "to
 take exclusive possession of" or "to set
 apart for or assign to a particular purpose or use
 Appropriate, Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/appropriate
 [https://perma.cc/JS4J-4SF2] (emphasis added). Thus, Senate
 Bill 213 clearly provided that "only that quantity of
 water" not already exclusively possessed or assigned to
 another is available for withdrawal pursuant to a well
 permit.
 
 42
 
          ¶66
 Moreover, in our view, the General Assembly's instruction
 that "only that quantity of water" is
 unappropriated and therefore available for withdrawal
 evidences a legislative intent to impose a limit on the total
 quantity of groundwater a permittee may withdraw. See
 Only, Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/only
 [https://perma.cc/76T3-3HLB] (defining "only" as
 "alone in a class or category" or "solely,
 exclusively").
 
 
          ¶67
 And, as with the current version of the statute, this court
 has implicitly acknowledged the existence of a total
 volumetric limit on groundwater withdrawals for permits
 issued under Senate Bill 213. In Bargas, for
 example, we explained that through Senate Bill 213, "the
 General Assembly . . . limited withdrawals of
 nontributary ground water to the amount of water
 underlying the well owner's land." 986 P.2d at 269
 n.16 (emphases added).
 
 
          ¶68
 Accordingly, we hold that a total volumetric limit on
 withdrawals of nontributary Denver Basin groundwater is
 implied in and applies to all well permits issued under
 Senate Bill 213, even if such a limit is not explicitly
 stated in the permit or decree.
 
 
          D.
 The Statewide Nontributary Ground Water Rules Unambiguously
 Impose a Total Volumetric Limit
 
 
          ¶69
 This same logic leads us to reject Parker's contention
 that a total volumetric limitation is not authorized by the
 Statewide Nontributary Ground Water Rules. We agree with the
 water court that the unambiguous language of Rule 8 of the
 
 43
 
 Statewide Nontributary Ground Water Rules imposes a total
 volumetric limit on the withdrawals of nontributary
 groundwater from Denver Basin wells. The relevant portions of
 Rule 8 read as follows:
 
 
 A. The allowed average annual amount of withdrawal shall be
 based on an aquifer life of 100 years in accordance with
 Section 37-90-137(4)(b)(I), C.R.S. The allowed average annual
 amount of withdrawal for all of the wells on the overlying
 land shall not exceed one percent of the total amount of
 water, exclusive of artificial recharge, recoverable from a
 specific aquifer beneath the overlying land. However, the
 allowed annual amount of withdrawal may exceed the allowed
 average annual amount of withdrawal as long as the total
 volume of water withdrawn from the well or wells does not
 exceed the product of the number of years since the . . .
 issuance of the well permit . . . times the allowed average
 annual amount of withdrawal.
 
 
 B. The total amount of water recoverable from a specific
 aquifer from a well or wells shall be determined by
 multiplying the number of acres of overlying land . . . by
 the average number of feet of saturated aquifer materials in
 the aquifer underlying those lands by the average specific
 yield of those saturated aquifer materials. The allowed
 average annual amount of withdrawal shall be 1% of the total
 recoverable water....
 
 
 Div. of Water Res., 2 Colo. Code Regs. 402-7:8 (2024).
 
 
          ¶70
 By setting forth a formula the State Engineer is to use in
 determining a "total amount of water recoverable,"
 Rule 8(B) plainly sets forth a total quantity of water that a
 permittee is allowed to withdraw under a well permit. The
 fact that this quantity is then used to calculate the allowed
 average annual amount of withdrawal does not strip it of its
 independent significance: Over the lifetime of a well permit,
 a permittee may only withdraw "the total amount of water
 
 44
 
 recoverable," as determined by the State Engineer at the
 time the permit is issued. Rule 8(B) explicitly states as
 much, explaining that "the allowed average annual amount
 of withdrawal shall be 1% of the total recoverable
 water." This provision necessarily imposes a total
 volumetric limit.
 
 
          ¶71
 If a permittee withdraws the maximum allowed average annual
 amount of withdrawal each year, then at the end of year 100,
 the permittee will have withdrawn 100 percent of the
 "total amount of water recoverable." Were we to
 adopt Parker's construction-allowing a permittee to
 continue withdrawing water in perpetuity so long as the well
 is able to draw water-then a permittee would be able to
 withdraw more than 100% of the quantity of water the
 State Engineer determined to be underlying the land. Such a
 result is plainly illogical, as it would allow for the mining
 of water beyond the amount underlying the applicant's
 land. As we have explained, we must avoid regulatory
 interpretations that lead to illogical results.
 
 
          ¶72
 Thus, when read as a whole, the Rules unambiguously impose a
 total volumetric limit on nontributary groundwater
 withdrawals from Denver Basin wells over the lifetime of a
 well permit.
 
 
          E.
 The State Engineer Has the Authority to Impose a Total
 Volumetric Limit
 
 
          ¶73
 Parker next contends that the State Engineer lacks the
 authority to impose a total volumetric limit on nontributary
 groundwater withdrawals. In Parker's
 
 45
 
 view, the State Engineer's inclusion of such a limit was
 arbitrary and capricious, contrary to law, and constituted an
 abuse of discretion. Again, we disagree.
 
 
          ¶74
 Through the Colorado Groundwater Management Act, the General
 Assembly delegated to the State Engineer the duty and
 authority to issue and administer nontributary groundwater
 well permits in accordance with the statute. V Bar Ranch
 LLC, 233 P.3d at 1206; § 37-90-110(1), C.R.S.
 (2024). Given our conclusion that the statute and the Rules
 unambiguously limit the total amount of nontributary Denver
 Basin groundwater that may be withdrawn over the lifetime of
 a well permit, we hold that the State Engineer has the
 authority to impose such a limit.
 
 
          ¶75
 We reiterate that the State Engineer's inclusion of a
 stated total volumetric limit on well permits, while a change
 in form, is not a change in substance: All nontributary
 Denver Basin well permits, whether they explicitly state a
 total limit or not, necessarily include an implicit total
 volumetric limit of one hundred times the allowed average
 annual amount of withdrawal.
 
 
          F.
 The State Engineer's Inclusion of a Total Volumetric
 Limit Does Not Violate or Impair Parker's Decreed
 Nontributary Groundwater Rights
 
 
          ¶76
 As previously noted, a landowner can perfect their inchoate
 right to use nontributary groundwater either by obtaining a
 well permit and constructing a well or by applying for and
 receiving a water court decree determining their rights
 
 46
 
 in the groundwater. In this case, most of Parker's well
 permits were issued pursuant to water court decrees that
 adjudicated the groundwater underlying the land and
 established Parker's vested groundwater rights. Parker
 contends that because these decrees lacked an explicit total
 volumetric limit and many also contained language requiring
 the State Engineer to issue permits in accordance with, and
 no more burdensome than, the terms of the decree, the State
 Engineer's inclusion of the total volumetric limit in its
 well permits violated the terms of its existing decrees and,
 as a result, impairs its vested groundwater rights. We are
 not persuaded.
 
 
          ¶77
 Through the Water Right Determination and Administration Act
 of 1969 and subsequent amendments, the General Assembly
 imbued water courts with exclusive jurisdiction over water
 matters, including the authority to adjudicate and determine
 nontributary groundwater rights. Sections 37-92-302 to -305,
 C.R.S. (2024), lay out the procedure by which a water court
 may adjudicate water rights and rights in nontributary
 groundwater, but the extent of a right to nontributary
 groundwater is nonetheless governed by the same statutory
 provisions applicable to well permits for such groundwater.
 This is apparent from the plain language of section
 37-90-137(6), which provides that "[r]ights to
 nontributary groundwater outside of designated groundwater
 basins may be determined in accordance with the procedures of
 sections 37-92-302 to 37-92-305," but that any
 "determination of
 
 47
 
 the right to such water for existing and future uses . . .
 shall be in accordance with subsections (4) and (5)
 of this section." (Emphasis added.) Accordingly, any
 decree determining rights to nontributary groundwater is
 subject to the statutory limitations set forth in section
 37-90-137(4), even if the decree is silent as to this
 limitation. And, because the plain language of section
 37-90-137(4) imposes a total volumetric limit on groundwater
 withdrawals pursuant to a well permit, a total volumetric
 limit is likewise, by necessity, implied in every water
 decree determining a right to use nontributary groundwater.
 Like the State Engineer, a water court cannot calculate and
 impose an allowed annual amount of withdrawal without
 initially quantifying a total volume of water underlying an
 applicant's land.
 
 
          ¶78
 This construction is also consistent with earlier decisions
 of this court that have implicitly recognized such a limit.
 In N. Kiowa-Bijou, for example, we explained that a
 water court's "[a]djudication of nondesignated
 Denver Basin ground water enabled the landowner . . . to
 obtain a decree establishing a use right to withdraw water at
 a later time for a specific quantity of Denver Basin
 ground water underneath her land." 77 P.3d at 75
 (emphasis added); see also id. at 66 ("A use
 right is a specific entitlement to a quantity of
 Denver Basin ground water ...." (emphasis added)).
 Before issuing a decree, "the court determines the
 amount of
 
 48
 
 nontributary ground water . . . that the landowner may
 withdraw." Id. at 71 (emphasis added).
 
 
          ¶79
 We reiterate that a nontributary groundwater right is an
 inchoate right in the overlying landowner to use that
 groundwater lying beneath the land. Because the
 landowner's nontributary groundwater right vests when the
 court issues a decree establishing that right, the relevant
 quantity of water is that quantity underlying the land when
 the decree is issued. In other words, the total amount of
 water available for withdrawal is fixed at the time the
 decree is entered.
 
 
          ¶80
 Thus, for the same reasons that we read section 37-90-137(4)
 as setting forth and requiring a total volumetric limit on
 the amount of water that may be withdrawn from Denver Basin
 aquifers over the lifetime of a well permit, we now hold that
 a total volumetric limit is implied in every water court
 decree establishing the right to use nontributary Denver
 Basin groundwater, unless a decree determining a right to use
 that water explicitly provides otherwise.
 
 
          G.
 The Water Court Did Not Abuse Its Discretion in Staying
 Discovery
 
 
          ¶81
 Finally, we address Parker's contention that the water
 court abused its discretion by staying all discovery until it
 ruled on the State Engineer's counterclaim. Through its
 motion for discovery, Parker sought to introduce evidence as
 to the meaning of the applicable statutory provisions and the
 Rules.
 
 49
 
          ¶82
 When presented with questions of statutory interpretation,
 courts must first analyze the plain language of the statute.
 Recall that, where the language is ambiguous-i.e.,
 susceptible to multiple interpretations-courts may consider
 extraneous evidence as to its meaning and apply tools of
 statutory construction to determine the legislative intent.
 But if the language is unambiguous, courts must enforce the
 statute as written and "look no further." Bd.
 of Cnty. Comm'rs v. Costilla Cnty. Conservancy
 Dist., 88 P.3d 1188, 1193 (Colo. 2004). Here, the water
 court found the relevant language unambiguous and resolved
 each of the questions of law before it on the plain language.
 Because we agree with the water court that the statute and
 the Rules are unambiguous, we conclude that the water court
 acted within its broad discretion in staying discovery.
 
 
          IV.
 Conclusion
 
 
          ¶83
 For the foregoing reasons, we conclude that (1) section
 37-90-137 unambiguously sets forth a total volumetric limit
 on withdrawals of nontributary Denver Basin groundwater over
 the lifetime of a well permit equal to the quantity of water
 underlying the landowner's land as determined by the
 State Engineer at the time the State Engineer issues a
 permit; (2) well permits issued under Senate Bill 213 are
 also subject to this total volumetric limit; (3) the
 Statewide Nontributary Ground Water Rules likewise
 unambiguously impose a total volumetric limit; (4) the State
 Engineer has the authority to include this total
 
 50
 
 volumetric limit on nontributary groundwater well permits;
 (5) water court decrees determining use rights for
 nontributary Denver Basin groundwater set forth a total
 volumetric limit on withdrawals unless an underlying decree
 determining a right to use that water explicitly provides
 otherwise; and (6) the water court did not abuse its
 discretion in staying discovery.
 
 
          ¶84
 Accordingly, we affirm the orders of the water court.
 
 
          
 JUSTICE BOATRIGHT dissented.
 
 51
 
          
 JUSTICE BOATRIGHT, dissenting.
 
 
          ¶85
 Today the majority concludes that "the plain language of
 section 37-90-137(4)[, C.R.S. (2024),] unambiguously imposes
 a total volumetric limit on the amount of nontributary Denver
 Basin groundwater a permittee may withdraw over the lifetime
 of a well permit." Maj. op. ¶ 62. But for the past
 fifty years, landowners outside of designated groundwater
 basins have believed their nontributary pumping rights to be
 limited only by (1) the annual rate of withdrawal specified
 in their well permit or water court decree, and (2) the
 physical quantity of recoverable water underlying their land.
 By introducing a new limit-a total volumetric cap and
 interrelated 100-year permit lifetime, determined by the
 State Engineer at the time of permit issuance-the
 majority's ruling upends these expectations. Moreover,
 the majority's interpretation curtails vested water
 rights, not just in the Denver Basin, but statewide. This
 construction of the statute requires the conclusion that the
 General Assembly abrogated these rights with neither express
 language nor any debate in the legislature. The
 plain language, lengthy legislative history, and this
 ruling's likely consequences lead me to conclude that the
 legislature never intended to cap pumping after 100 years.
 Instead, I present the following version of events in support
 of my conclusion.
 
 
          ¶86
 In 1973, the State Engineer's Office ("SEO")
 asked the legislature for guidance to support the SEO's
 issuance of well permits in the Denver Basin.
 
 52
 
 Specifically, the SEO sought a statutory determination
 regarding how long of an "aquifer life" it should
 use as the basis for its engineering determinations. In
 essence, the question that the SEO posed to the legislature
 was: How long do you want the groundwater in the state's
 nontributary aquifers, including the Denver Basin aquifers to
 last? The answer: at least 100 years.
 
 
          ¶87
 To achieve that goal, the legislature enacted section
 37-90-137, balancing its twin aims of economic development
 and prudential use of the state's water resources. In so
 doing, the legislature decided to allow continued pumping,
 but also to regulate annual withdrawal rates such that no
 landowner would exhaust their underlying water in less than
 100 years. Accordingly, the legislature directed the SEO to
 ensure that permittees "sipped slowly" by issuing
 permits with pumping rates based on achieving a minimum
 aquifer life of 100 years. However, the legislature
 understood the uncertainty inherent in estimating, at the
 time of permit issuance, both the current and future
 quantities of recoverable groundwater underlying an
 applicant's land. Because of this uncertainty, the
 legislature knew it was possible that significant quantities
 of recoverable water might remain underlying permittees'
 lands after 100 years of pumping. To account for this
 possibility, section 37-90-137 guarantees landowners a
 minimum of 100 years of pumping, not a
 maximum.
 
 53
 
          ¶88
 But now, after fifty years of slow sipping, the SEO has
 unilaterally decided that landowners are only entitled to a
 "Total Amount of Recoverable Groundwater"
 ("TAW") and that their vested water rights expire
 after 100 years of pumping at the allowed annual rate. Under
 this regulatory scheme, any remaining water underlying their
 lands after 100 years of pumping would be left stranded and
 unused. This result would serve neither of the
 legislature's goals because it would both shut down
 economic development and put additional strain on the
 state's water resources.
 
 
          ¶89
 I am of the opinion that the plain language of the
 statute entitles the landowner to "that quantity of
 water . . . underlying the land owned by the applicant."
 § 37-90-137(4)(b)(II). The SEO's TAW merely
 estimates this quantity. Thus, inferring that this language
 unambiguously limits the amount of water a landowner may
 withdraw to anything other than the actual, physical amount
 of water underlying the land is contrary to the plain
 language of the statute; it interferes with landowners'
 vested rights; and ultimately it will leave valuable water
 unused. Hence, I respectfully dissent.
 
 
          I.
 Imposition of a TAW Is Not Supported by the Plain Language of
 the Relevant Statutes or Regulations
 
 
          A.
 The Statutes Do Not Include Authority for a TAW
 
 
          ¶90
 In construing statutes, we aim to effectuate the
 legislature's intent by giving words their ordinary,
 common meaning at the time of enactment.
 
 54
 
 People ex rel. Rein v. Meagher, 2020 CO 56, ¶
 22, 465 P.3d 554, 559. We look to the entire statutory scheme
 to give "consistent, harmonious, and sensible effect to
 all of its parts," and we "avoid constructions that
 would render any words or phrases superfluous or that would
 lead to illogical or absurd results." Id., 465
 P.3d at 559-60 (first quoting UMB Bank, N.A. v. Landmark
 Towers Ass'n, 2017 CO 107, ¶22, 408 P.3d 836,
 840; and then quoting Dep't of Revenue v. Agilent
 Techs., Inc., 2019 CO 41, ¶ 16, 441 P.3d 1012,
 1016). Because "we respect the legislature's choice
 of language . . . we do not add words to or subtract words
 from a statute." Id., 465 P.3d at 560. And if
 the statutory language is not susceptible to multiple
 interpretations, i.e., it is "clear and
 unambiguous," we look no further than the language.
 Larimer Cnty. Bd. of Equalization v. 1303 Frontage
 Holdings LLC, 2023 CO 28, ¶ 29, 531 P.3d 1012,
 1020.
 
 
          ¶91
 The pertinent statutory language is found in the Colorado
 Groundwater Management Act ("CGMA"), section
 37-90-137, which sets forth the parameters for wells across
 the state, other than those in designated basins, that
 withdraw nontributary groundwater. In my view, the plain
 language of the CGMA, along with a related portion of section
 37-92-305, C.R.S. (2024), which provides water courts with
 retained jurisdiction over determinations of rights for wells
 made pursuant to 37-90-137(4), make clear that the
 legislature did not intend to impose a volumetric cap.
 
 55
 
          ¶92
 The first relevant portion of the CGMA is section
 37-90-137(4)(b), which contains two subsections. Subsection
 (4)(b)(I) states that "[p]ermits issued . . . shall
 allow withdrawals on the basis of an aquifer life of one
 hundred years." § 37-90-137(4)(b)(I). Subsection
 (4)(b)(II) provides that "the amount of such groundwater
 available for withdrawal shall be that quantity of water,
 exclusive of artificial recharge, underlying the land owned
 by the applicant." § 37-90-137(4)(b)(II).
 
 
          ¶93
 As the water court acknowledged in its order, and the parties
 agree, the first subsection, subsection (4)(b)(I), sets
 "the rate at which the available quantity of
 nontributary groundwater may be withdrawn-not the
 amount." Parker Water &Sanitation Dist.
 v. Rein, No. 21CW3046, at 14 (Dist. Ct., Water Div. 1,
 Mar. 2, 2023). The statute plainly directs the SEO to issue
 permits to withdraw water at rates set "on the basis
 of" a 100-year aquifer life. § 37-90-137(4)(b)(I).
 Importantly, subsection (4)(b)(I) does not say that
 the SEO must allow withdrawals for 100 years.
 Indeed, subsection (4)(b)(I) sets no time or volume
 limitation-it only sets the rate at which the water may be
 withdrawn. It is the next subsection, subsection (4)(b)(II),
 that, by its plain language, sets the amount that
 may be withdrawn: "[T]he amount of such groundwater
 available for withdrawal shall be that quantity of water,
 exclusive of artificial recharge, underlying the land owned
 by the applicant." § 37-90-137(4)(b)(II). Again,
 importantly, the only limit subsection
 
 56
 
 (4)(b)(II) places on the amount a landowner may withdraw is
 the actual, physical quantity of underlying water. But
 despite the plain language, the majority decides that the
 statute unambiguously requires the SEO to set a TAW.
 
 
          ¶94
 In reaching that conclusion, the majority relies on its
 construction of subsection (4)(b)(II). First, the majority
 references Black's Law Dictionary for the proposition
 that a "quantity" must, by definition, be
 "measurable." Maj. op. ¶ 49. Next, the
 majority reasons that because the quantity of water
 underlying an applicant's land will change over time, and
 because that quantity must be measurable, the SEO must
 calculate the quantity of available water at the time of
 permit issuance. Maj. op. ¶ 53. The majority then
 interprets the SEO's estimated quantity of water to be a
 total volumetric cap, forever limiting the landowner's
 rights in their underlying water. Maj. op. ¶¶ 60,
 62.
 
 
          ¶95
 However, the statute does not entitle landowners to an
 estimated quantity of water, but plainly to the
 "quantity" of water underlying their land. That
 means the entire quantity of water under their land.
 Nothing in subsection (4)(b)(II) requires the SEO to quantify
 the amount of underlying water such that its determination
 binds landowners in perpetuity, regardless of the actual
 hydrogeology. If the General Assembly intended for permits to
 expire after 100 years of use, then why not say so? Simply
 omitting the majority's cap better aligns with the plain
 language of subsection (4)(b), as I demonstrate below.
 
 57
 
          ¶96
 When issuing a permit, the SEO first estimates the
 "quantity of water . . . underlying the land owned by
 the applicant." § 37-90-137(4)(b)(II). Next, the
 SEO divides this amount by 100. The resulting rate satisfies
 subsection (4)(b)(I)'s requirement that "[p]ermits
 issued . . . shall allow withdrawals on the basis of an
 aquifer life of one hundred years." §
 37-90-137(4)(b)(I). And when withdrawn at this rate, without
 a cap, the ultimate amount available to the landowner remains
 as "that quantity of water . . . underlying the
 land," as mandated by subsection (4)(b)(II).
 Unsurprisingly, the SEO has been calculating the allowed
 annual rate of withdrawal this way for fifty years.
 
 
          ¶97
 The second relevant aspect of the CGMA is its policy of
 promoting nontributary groundwater development and its
 related provisions regarding material injury. The legislative
 declaration contained in section 37-90-102(2), C.R.S. (2024)
 "recognizes the unique, finite nature of nontributary
 groundwater resources outside of designated groundwater
 basins" and declares that this groundwater "shall
 be devoted to beneficial use in amounts based upon
 conservation of the resource and protection of vested water
 rights." It clarifies that "[e]conomic development
 of this resource shall allow for the reduction of hydrostatic
 pressure levels and aquifer water levels consistent with the
 protection of appropriative rights in the natural stream
 system." Id. The declaration states
 
 58
 
 that, "To continue the development of nontributary
 groundwater resources consonant with conservation shall be
 the policy of this state." Id.
 
 
          ¶98
 To execute this policy, the statute directs the SEO to issue
 permits to overlying landowners if it finds that "there
 is unappropriated water available for withdrawal . . . and
 that the vested water rights of others will not be
 materially injured." §
 37-90-137(2)(b)(I)(A) (emphases added). However, the
 legislature clarifies that, "Material injury to vested
 nontributary groundwater rights shall not be deemed
 to result from the reduction of either hydrostatic pressure
 or water level in the aquifer." § 37-90-137(4)(c)
 (emphasis added). This language, along with section
 37-90-102(2)'s declaration that "[e]conomic
 development of this resource shall allow for the reduction of
 hydrostatic pressure levels and aquifer water levels,"
 shows that the legislature understood that reductions in
 pressure and water levels are the inherent results of
 nontributary groundwater development. As soon as development
 of these "finite" aquifers begins, water and
 pressure levels begin to drop. Thus, because the CGMA
 promotes development of nontributary groundwater, the statute
 makes clear that reductions in hydrostatic pressure or water
 levels shall not be deemed to be material injury.
 § 37-90-137(4)(c). To achieve the CGMA's policy of
 balancing development with "conservation of the resource
 and protection of vested water rights," §
 37-90-102(2), the statute's "sip slowly"
 provisions, discussed above, use a
 
 59
 
 conservative rate of withdrawal, and relatedly, well spacing,
 to mitigate concerns regarding pressure and water levels
 being reduced too quickly.
 
 
          ¶99
 But despite this language, the majority concludes that
 "[a]bsent a total volumetric limit, a permittee who
 continues to pump at the maximum permitted rate for more than
 100 years would end up pulling water to its well that would
 not otherwise be underlying its land" and that "the
 result would be a race to the bottom of the aquifer, with
 earlier permittees receiving a significant head start."
 Maj. op. ¶¶ 54-55. While these concerns may be
 understandable from a policy perspective, they are ultimately
 concerns over reductions to later permittees' water and
 hydrostatic pressure levels. Because reductions to a
 permittee's underlying pressure and water levels are
 explicitly not material injury, in my view, the
 majority's focus on guarding them is contrary to the
 plain language of the statute.
 
 
          ¶100
 Third and finally, when the legislature fleshed out the
 CGMA's nontributary groundwater scheme with Senate Bill
 85-5 ("S.B. 5"), discussed further below, it also
 added language to section 37-92-305, regarding retained
 jurisdiction for water courts. § 37-92-305(11). Section
 37-92-305 guides water courts in nontributary groundwater
 right determination and administration. The language added by
 S.B. 5 empowers water courts to retain jurisdiction over
 determinations of pumping rights made under section
 37-90-137(4) "as necessary
 
 60
 
 to provide for the adjustment of the annual amount
 of withdrawal allowed to conform to actual local aquifer
 characteristics." § 37-92-305(11) (emphasis added).
 There is no provision for adjustment of the total
 allowable withdrawal. One would think that if the legislature
 intended a TAW to exist, then when it updated the CGMA and
 section 37-92-305 it would have simultaneously empowered
 water courts to adjust this cap based on new information, as
 it did for the pumping rate. But, yet again, the plain
 language of the statutes does not provide for a total
 volumetric cap.
 
 
          ¶101
 The plain language of the statues assigns nontributary
 groundwater to a definite use: "beneficial use in
 amounts based upon conservation of the resource and
 protection of vested water rights." § 37-90-102(2).
 But under the policy created by the majority today, unless
 the legislature rewrites the statutes, any water remaining
 after 100 years of pumping, perhaps a substantial amount,
 will never be put to beneficial use as the
 legislature commanded.
 
 
          B.
 The Regulations Do Not Include Authority for a TAW
 
 
          ¶102
 The relevant regulations, promulgated by the SEO in 1986,
 also do not support the imposition of a TAW. Rule 8 of the
 Statewide Nontributary Ground Water Rules provides the
 procedures by which the SEO calculates applicants' annual
 pumping rates. Div. of Water Res., 2 Colo. Code Regs. 402-7:8
 (2024). Accordingly, the rule is titled "Determination
 of Allowed Annual Amount of
 
 61
 
 Withdrawal." Id. Rule 8 contains two subparts:
 Rules 8(A) and 8(B). While the details of the rule are highly
 technical, the broad strokes are most relevant to the issues
 here.
 
 
          ¶103
 Rule 8(A) reemphasizes that pursuant to section 37-90-137(4),
 the SEO must set annual pumping rates based on an aquifer
 life of 100 years. Div. of Water Res., 2 Colo. Code Regs.
 402-7:8(A) (2024). Next, Rule 8(B) guides the SEO in
 calculating the "allowed average annual amount of
 withdrawal." Div. of Water Res., 2 Colo. Code Regs.
 402-7:8(B) (2024). Under Rule 8(B), the SEO first estimates
 the total amount of recoverable water underlying an
 applicant's land. To do so, it multiplies three
 variables: (1) the acres of overlying land, (2) the saturated
 depth, and (3) the specific yield of the underlying aquifer.
 Id. To finish its calculation, the SEO divides the
 product of these variables by 100. Id. The resulting
 "average annual amount" is a rate of withdrawal
 that allows permittees to pump one onehundredth of their
 estimated underlying water per year. Id. This is the
 mechanism that achieves the legislature's goal of
 guaranteeing permittees at least a 100-year water supply.
 
 
          ¶104
 The majority opinion leans heavily on Rule 8 for its
 conclusion that the SEO may impose a TAW. Specifically, the
 majority relies on Rule 8(B)'s directive that: "The
 allowed average annual amount of withdrawal shall be 1% of
 the total recoverable water." Id.
 (emphasis added); see also Maj. op. ¶ 70. Rule
 8(A) includes
 
 62
 
 similar language, stating that the annual rate of withdrawal
 "shall not exceed one percent of the total amount of
 water . . . recoverable." Div. of Water Res., 2 Colo.
 Code Regs. 402-7:8(A) (2024). The majority concludes that
 this language unambiguously sets forth the SEO's
 authority to both find a TAW and impose it as a limiting cap
 on the amount of water a well permittee may use. Maj. op.
 ¶ 70.
 
 
          ¶105
 I concede that Rule 8 directs the SEO to estimate the amount
 of recoverable water underlying a landowner's property.
 Indeed, in my view, this is the closest any language in
 either the statute or rules comes to supporting the
 majority's interpretation. However, the rule does not
 mention either finding the total amount a well may withdraw
 over its lifetime, or imposing a cap. Further, unlike the
 allowed annual amount of withdrawal, the total
 amount of water recoverable has no commanding verb before it.
 If the SEO included "allowed" when discussing the
 annual amount to be withdrawn, why would it not have used
 similar language when discussing the total amount of water
 recoverable? It appears to me that it is because the total
 amount of water recoverable is not the end goal of these
 calculations. Instead, as reinforced below, the total amount
 of recoverable water is simply a number used in calculating
 the allowed annual rate of withdrawal, which is the
 operative limitation authorized by statute.
 
 
          ¶106
 Indeed, once Rule 8 is read in context, this purpose becomes
 clear. The rules incorporate by reference the Statement of
 Basis and Purpose for the Adoption of
 
 63
 
 Statewide Nontributary Ground Water Rules (the
 "Statement"), which was contemporaneously submitted
 to the Colorado Secretary of State. Div. of Water Res., 2
 Colo. Code Regs. 402-7:18 (2024). The Statement explains
 that, "Rule 8.B. specifies the formula to be used to
 calculate the allowed average annual amount
 of withdrawal. Its purpose is to standardize that
 calculation." Div. of Water Res., Statement of
 Basis and Purpose for the Adoption of Statewide Nontributary
 Groundwater Rules, at 7 (1986) (emphases added). Thus,
 the plain language of the rules declares that the purpose of
 Rule 8(B) is to standardize the calculation for
 finding the allowed average annual amount of
 withdrawal. The Statement does not say that the amount of
 recoverable water the SEO must estimate under Rule 8(B) is
 meant to be binding in perpetuity, but instead, indicates
 that this amount is merely a tool the SEO uses when
 calculating the real goal - the allowed annual withdrawal.
 Nor does the Statement say that the purpose of Rule 8(B) is
 to determine the total amount a well may withdraw over 100
 years. Indeed, nowhere in the regulations does such a purpose
 appear.[1]
 
 64
 
          C.
 Review of the Plain Language
 
 
          ¶107
 In sum, landowners who have obtained either a decree from a
 water court or a well permit from the SEO enjoy a vested
 right in the actual quantity of water underlying their land.
 The statute directs the SEO to set annual pumping rates such
 that landowners are guaranteed a minimum useful aquifer life
 of 100 years. This is how the SEO has administered
 undesignated nontributary groundwater for fifty years.
 Nowhere in the statutes or rules is there mention of a total
 volumetric pumping limit or related 100-year permit lifetime.
 The SEO cannot now create a limitation on vested property
 rights where the legislature did not command it. Accordingly,
 I am of the opinion that the statutes and rules are plain in
 their meaning, only contemplate an allowed annual withdrawal,
 and do not support the SEO's imposition of a "total
 amount of recoverable water."
 
 
          ¶108
 In many cases, the simplest explanation is the correct one. I
 believe that is the case here: The plain language only refers
 to an allowed annual rate of withdrawal because that was what
 the legislature intended to regulate. However, it appears
 that reasonable minds could differ in their interpretation of
 the statutes and rules, and in fact, have. Thus, because the
 relevant language is susceptible to more than one meaning, I
 assume that the statute is ambiguous. Accordingly, it is
 appropriate to look to other aids of statutory construction,
 such as the legislative
 
 65
 
 history. And in my opinion, the relevant history supports my
 statutory interpretation.
 
 
          II.
 The Legislative History Supports the Conclusion that the
 General Assembly Never Intended a 100-year Volumetric
 Limitation
 
 
          ¶109
 When statutory language is ambiguous, "we may consider
 other aids to statutory construction, such as the
 consequences of a given construction, the end to be achieved
 by the statute, and legislative history." 1303
 Frontage Holdings LLC, ¶ 29, 531 P.3d at 1020
 (quoting Bostelman v. People, 162 P.3d 686, 690
 (Colo. 2007)); see also § 2-4-203, C.R.S.
 (2024). This court has frequently looked to the statutory
 history of the water law statutes to find intent in what is
 admittedly a complex scheme. I begin by reviewing the history
 of Senate Bill 73-213, which adopted the first statutory
 system for allocating and administering nontributary
 groundwater. Following that, I review the history of Senate
 Bill 85-5, which clarified the law around permits for wells
 outside of designated basins.
 
 
          A.
 The History of Senate Bill 73-213 Includes No Discussion of a
 Cap
 
 
          ¶110
 In 1973, the General Assembly passed Senate Bill 213
 ("S.B. 213"), establishing that the right to
 withdraw nontributary groundwater would be subject to
 overlying land ownership. Ch. 441, sec. 1, § 148-18-36,
 1973 Colo. Sess. Laws 1520, 1520 (now codified at §
 37-90-137(4)). The legislative history surrounding the bill
 is lengthy and unveils what the legislature hoped to achieve.
 
 66
 
          ¶111
 At the first hearing introducing the bill, Don Hamburg, SEO
 attorney and proponent of the bill, explained its purpose.
 Hearing on S.B. 213 before the S. Comm. on Agric., Livestock,
 &Nat. Res., 49th Gen. Assemb., 1st Sess. (Mar. 5, 1973).
 He explained that the SEO had been "inundated with
 requests for permits to construct wells" and that the
 SEO needed direction because it had no guidelines on how to
 grant the permits. Id. Mr. Hamburg also noted that
 there was "a lot of water in the Denver Basin and a lot
 can be used," and that lacking guidance from the
 legislature, the SEO had proposed language in S.B. 213 that
 would set the aquifer life to 100 years. Id. He
 clarified: "There is nothing sacred about that. If the
 legislature determines it should be twenty-five years,
 that's fine, or if it should be fifty, that's fine.
 If it should be 200-we don't know but all we're
 thinking is some type of guideline as to how to grant
 these." Id. Mr. Hamburg concluded, "[I]t
 boils down to a lifetime, of how long you want it to
 last." Id.
 
 
          ¶112
 In response, Senator Harry M. Locke asked Mr. Hamburg
 "How are you going to determine whose water you might be
 taking?" Id. Mr. Hamburg started by noting that
 the aquifers at issue are well-defined, and that after being
 penetrated, pumping creates a cone or cylinder of depression
 from which water is drawn down over time. Id. Next,
 he explained that by setting a time period, such as 100
 years, and a withdrawal rate tied to that time period, wells
 can be spaced such that the cones of depression will not
 intersect for the set time period. Id.
 
 67
 
          ¶113
 Jack Ross, an attorney representing water districts,
 summarized that nontributary groundwater is a finite
 resource, and that "[t]he question to the legislature
 is: 'How long do you want to make that resource work for
 us? Do you want to let it be worked out in twenty years or
 thirty years or 100 years or 200 years? You can make that as
 a legislative determination, regardless of the
 facts.'" Id. He agreed with Mr. Hamburg
 that, with that determination, the SEO could then "go
 back to the drawing board with our engineering evaluations
 and figure out what kind of well spacing is needed . . . to
 parcel it out within that framework." Id.
 
 
          ¶114
 From this first legislative session, it is clear that 100
 years was neither "sacred" nor even tied to fact.
 Instead, the legislature's goal was to provide a
 declaration that the SEO could use as a basis for its
 issuance of well permits. Those permits would feature annual
 withdrawal rates that ensured a 100-year aquifer life while
 also facilitating well spacing that would avoid injury to
 others with vested rights.
 
 
          ¶115
 A few days later, Harlan Erker, SEO engineer and chief of
 ground water operations, testified that "the gallons per
 minute is not critical, the number of acrefeet per year is
 ...." Hearing on S.B. 213 before the S. Comm. on Agric.,
 Livestock, & Nat. Res., 49th Gen. Assemb., 1st Sess.
 (Mar. 7, 1973). Senator Wunsch soon interjected:
 "There's nothing about volumetric rights in your
 bill." Id. Mr. Erker
 
 68
 
 responded: "Right, but that comes in, in the life of the
 aquifer again. In other words, they can pump-in 100 years, in
 their cylinders, they get to pump one onehundredth of that
 cylinder in any year." Id. (emphasis
 added). Similarly, at a later meeting, Jack Ross
 testified that "when someone comes to ask for a well
 permit, you analyze the depth or the thickness of the
 saturated sands, you determine the maximum pumping rate that
 you think is realistic." Hearing on S.B. 213 before the
 H. Comm. on Nat. Res., 49th Gen. Assemb., 1st Sess. (June 6,
 1973). He continued, "That is all the state engineer
 would do." Id. This testimony shows that the
 drafters understood that "all the state engineer would
 do" is "determine the maximum pumping rate."
 Id. There is no mention of the SEO determining a
 total volumetric limit.
 
 
          ¶116
 At another hearing, the SEO again recognized that the
 100-year aquifer life was a policy choice. Mr. Erker stated,
 "We don't know if 100 years is right. It's not
 an engineering decision. We're asking you for this
 particular figure. If you tell us that seventy-five years is
 right, we'll believe you. If you tell us that 150 years
 is right, we'll believe you." Hearing on S.B. 213
 before the S. Comm. on Agric., Livestock, &Nat. Res.,
 49th Gen. Assemb., 1st Sess. (Mar. 14, 1973). He continued,
 "We don't really know what the life of that aquifer
 is .... The life of the aquifer depends on how many wells you
 put into it." Id. When a stakeholder wondered
 where the 100-year figure originated, State Engineer Clarence
 J. Kuiper
 
 69
 
 answered, "Well, I can tell you where the 100 years came
 from, right off the top of my head. To give the committee a
 figure to start with. They may want to go to twenty-five or
 200 . . . it's just so we can have some kind of guideline
 so when a subdivision developer goes in, that home builder
 knows that he has a water supply for a given length of
 time." Id.
 
 
          ¶117
 Consultant Herb Wells responded, "[B]efore we spend that
 money, I want to be darn sure that what I'm providing is
 a permanent supply of water .... I want to know that when you
 go into that house you'll have water for your lifetime,
 your children will have water for their lifetime, and their
 children will. I'm not saying 100 years .... This is a
 utility point of view." Id. Senator Kenneth
 Kinnie supported that statement by saying, "What I think
 is important is that we have got to make up our minds how
 long the legislature is going to obligate the state in the
 life of the well, for the people that buy the homes, how long
 that we say that they're going to have water."
 Id. Soon after, Mr. Ross responded, "It is a
 function of economics as well as a political judgment of
 sociology, because if you say it is going to be 200 years and
 that makes the well radius three miles, then no one will
 develop the resource." Id.
 
 
          ¶118
 This session shows that the legislators understood that the
 100-year aquifer life was a compromise that balanced prudent
 resource use with development. Those at the hearing
 recognized that it was a matter of economics. Expanding the
 
 70
 
 aquifer life would in turn expand the size of the cone of
 depression, which would increase the spacing that would be
 required between wells. Further spaced wells would require
 more labor and materials and would therefore be more costly.
 This economic consideration played a part in the
 drafters' decision to assign the aquifer a 100-year life,
 as opposed to a 200-year life. If the costs were
 "exorbitant," "no one w[ould] develop the
 resource." Id. And the drafters wanted the
 resource to be developed. Nowhere in this history does anyone
 consider that well users would have to stop pumping after 100
 years if there was still water left to pump. Quite the
 opposite; the legislators were keenly aware of both the high
 cost of setting wells and that their constituents sought
 permanent water supplies.
 
 
          ¶119
 About a month later, the committee unanimously amended the
 proposed legislation to include the word "minimum,"
 setting forth that the useful life of the aquifer was to be a
 minimum of 100 years. Hearing on S.B. 213 before the
 S. Comm. on Agric., Livestock, &Nat. Res., 49th Gen.
 Assemb., 1st Sess. (Apr. 9, 1973). Mr. Erker explained that
 "[w]hat we're saying is the minimum useful life of
 the aquifer is declared to be 100 years, assuming there is no
 outside water brought in." Id. Similarly, a few
 weeks later Mr. Ross testified, stating on behalf of his
 clients, "I want to be able to tell them, once they
 acquire a right to drill a well and develop this resource,
 that they are going to have 100-year practical life, or
 perhaps even longer, because things don't always work out
 the way the engineers expect it to."
 
 71
 
 Hearing on S.B. 213 before the S. Comm. on Agric., Livestock,
 &Nat. Res., 49th Gen. Assemb., 1st Sess. (May 7, 1973).
 
 
          ¶120
 Including the word "minimum" signals the
 drafters' acknowledgement that some wells might be able
 to pump for longer than 100 years. The legislators and the
 SEO needed to set a rate of withdrawal and decided to protect
 the expectation that the aquifer would be available to pump
 for at least 100 years. Similarly, Mr. Ross's
 testimony shows that those in attendance understood that S.B.
 213 would give well owners a "100-year practical life,
 or perhaps even longer." Id. There is no
 mention of a cap, or that permits would expire and pumps
 would be turned off after 100 years. If that were the case,
 the legislators could easily have assigned each
 permit a life of 100 years. And one would expect
 some discussion of a hard cap during the legislative process.
 
 
          ¶121
 In my opinion, this legislative history shows that S.B. 213
 was intended to set the minimum useful life of the aquifer so
 the SEO could have a measure by which to issue permits.
 Throughout the history, no one mentions limits on the amount
 of water landowners may use other than their annual allotment
 and the physical quantity of underlying water. No one
 expressed nor implied that pumping would cease after 100
 years where underlying water remained. The legislators
 clearly intended that landowners would be able to use their
 underlying water to exhaustion after at least 100
 years of pumping.
 
 72
 
          B.
 The History of Senate Bill 85-5 Includes No Discussion of a
 Cap
 
 
          ¶122
 In 1985, the General Assembly considered S.B. 5, which
 ultimately fleshed out the statutory scheme governing
 nontributary groundwater. S.B. 5 codified a definition for
 nontributary groundwater, made a legislative declaration as
 to its intended uses, further defined the system for
 allocating and administering nontributary groundwater outside
 of designated basins, and granted the State Engineer
 substantive rulemaking authority over the resource. Most
 relevant here, S.B. 213's language in the CGMA stating
 that "the minimum useful life of the aquifer is one
 hundred years" was changed to instead say
 "[p]ermits issued pursuant to this subsection (4) shall
 allow withdrawals on the basis of an aquifer life of one
 hundred years." Ch. 285, sec. 3, § 37-90-137(4)(b),
 1985 Colo. Sess. Laws 1160, 1163; see also §
 37-90-137(4)(b)(I). However, the legislative history shows
 that despite this change in language, the "minimum
 life" thrust of S.B. 213 remained intact.
 
 
          ¶123
 In the words of Charlie Elliott, who worked with the
 committee responsible for the bill, S.B. 5 "[kept] the
 main principles of Senate Bill 213." Hearing on S.B. 5
 before the S. Comm. on Agric., Nat. Res., &Energy, 55th
 Gen. Assemb., 1st Sess. (Jan. 24, 1985). He acknowledged,
 "The mining of this water . . . we're not going to
 allow it to go in a quick amount of time, but in 100 years,
 it could conceivably be depleted." Id.
 He continued, "[I]t will probably last much longer than
 that .... It
 
 73
 
 may last 100 years, it may last 150, or even 200 years, under
 this legislative proposal, which is the same proposal put
 into effect in '73. We're buying time."
 Id. He clarified, we "[d]on't want to shut
 it down, because that would have pretty drastic economic and
 social consequences in the state, and that's why the
 state decided that was not the policy that we're going to
 follow, back in '73 ...." Id. Mr.
 Elliot's testimony recognizes that neither S.B. 213 nor
 S.B. 5 intended to shut down the development of nontributary
 groundwater in the state.
 
 
          ¶124
 In addition to maintaining the policy goals of S.B. 213, S.B.
 5 defined material injury. At the first meeting on the bill,
 Senator Fred Anderson recognized that hydrostatic head
 pressure is affected by each new well, and that "you
 cannot depend on this pressure. Because if you do, then
 you'll never develop the resource." Hearing on S.B.
 5 before the S. Comm. on Agric., Nat. Res., &Energy, 55th
 Gen. Assemb., 1st Sess. (Jan. 24, 1985). He stated
 that in S.B. 5, "We make a very definite statement that
 it's not considered injury to the fact that you lose head
 pressure." Id. At a later meeting, David
 Harrison of the Colorado Water Congress, expanded on this
 idea, noting, "If your water table is going down, your
 remedy is to get a bigger pump yourself." Hearing on
 S.B. 5 before the H. Comm. on Agric., Livestock, &Nat.
 Res., 55th Gen. Assemb., 1st Sess. (May 8, 1985). He also
 explained that it was "not possible to protect pumping
 levels of other wells, except to make sure that they
 don't get sort of an unfairly exaggerated impact. And
 that's
 
 74
 
 what the spacing requirement is about." Id.
 Finally, he stated: "Everybody gets the same 100-year
 based allowance. The water table is going down; help
 yourself. It's that kind of situation." Id.
 (emphasis added).
 
 
          ¶125
 This testimony shows that the legislature never intended to
 protect hydrostatic head pressure or water levels in the
 aquifer, because doing so would severely stunt development of
 the resource. Instead, the history shows that the drafters
 chose to ensure fairness through proper well spacing, and
 relatedly, by regulating annual pumping rates. Mr.
 Harrison's statement that "[e]verybody gets the same
 100-year based allowance" neither expresses nor
 implies that pumping beyond 100 years would be forbidden. The
 only end-of-life limitation implied or expressed by this
 history is the actual, physical limitation of the underlying
 water being exhausted.
 
 
          ¶126
 At a subsequent meeting, David Getches, Executive Director of
 the Department of Natural Resources, reinforced this
 understanding when he testified, "The enactment of the
 proposal is effectively a legislative announcement that
 nontributary groundwater is available for total
 depletion in the next few generations." Hearing on
 S.B. 5 before the S. Comm. on Agric., Nat. Res., &Energy,
 55th Gen. Assemb., 1st Sess. (Mar. 7, 1985) (emphasis added).
 Later, Jim Gehn, a consultant with the Colorado Ground Water
 Association, explained the practical reality of mining the
 Denver Basin aquifers: "Certainly it's an economic
 
 75
 
 issue, also. In the year 2030, or '40 down the road,
 it's going to be very expensive to pump this nontributary
 water from the deeper aquifers." Id. At a
 subsequent hearing Mr. Gehn continued: "If we look at .
 . . the maximum build-out of the Denver Basin over the next
 seventy years, and extend that on to 100 years . . . we would
 deplete those four aquifers in Denver Basin 4% their total
 depletable amount." Hearing on S.B. 5 before the H.
 Agric. Comm., 55th Gen. Assemb., 1st Sess. (Mar. 26, 1985).
 He then summarized, "So to say that the 100-year life is
 going to totally be exhausted in 100 years, or to understand
 it that way, is erroneous." Id. Similarly, Mr.
 Elliott emphasized that, "Senate Bill 5 continues the
 conservation standard of the 100-year, minimum
 aquifer life. It doesn't say maximum, it says
 minimum .... [W]e're looking at very long
 periods of time before this water is depleted."
 Id.
 
 
          ¶127
 This testimony exhibits that while the drafters expected
 landowners to use their underlying water to total depletion
 eventually, they also expected the economics of drawing from
 deeper aquifers to provide an inherent check on pumping, in
 addition to the annual allotment determined by the SEO.
 Further, the above testimony shows that lawmakers understood
 that because of the vast quantity of water available, basing
 annual pumping rates on a minimum 100-year aquifer lifetime
 would not realistically result in critical depletion of the
 broader Denver Basin aquifers anytime soon.
 
 76
 
          ¶128
 Later, Senator Anderson spoke in favor of the bill: "I
 want to protect agricultural water. And I'll tell you
 this, the decision was made twelve years ago [with S.B. 213]
 that this is indeed a finite resource. And we're going to
 use it on a conservative basis, but we're going to use
 it." Id. He continued by explaining that
 "[d]evelopment is going to continue in Colorado. And if
 we don't develop this resource" the necessary water
 is "going to come from agricultural uses."
 Id.
 
 
          ¶129
 Senator Anderson's comments exemplify the
 legislature's intent that nontributary water would be
 used. Curtailing its development would force
 would-be users to obtain water from others who held water
 rights, which in many instances are agricultural-use rights.
 It is common knowledge that surface waters are already
 over-appropriated across the state. Thus, the legislature
 understood that leaving accessible nontributary water in the
 ground would inherently put additional strain on the
 state's other water resources.
 
 
          C.
 Review of the Legislative History
 
 
          ¶130
 In summary, the legislative history, like the statute's
 plain language, never discusses imposing a lifetime
 volumetric cap on nontributary wells. Many people
 representing a wide variety of interests testified at the
 legislative hearings on both bills, and never mentioned that
 a well permit would expire after 100 years of
 
 77
 
 pumping at the maximum permitted rate.[2] If the
 legislature ever considered such a limit, there would have
 been lengthy and heated debate over the issue. To put it
 modestly, this would have been a weighty and controversial
 policy change, even in 1973 and 1985, when there was less
 pressure on the state's water resources than exists
 today. In my view, it makes no sense to conclude that where
 the statute is silent as to a cap, and the legislative
 history never mentions a cap, that the legislature
 unambiguously intended for a cap to exist.
 
 
          III.
 The Majority's Construction Results in Consequences the
 General Assembly Never Intended
 
 
          ¶131
 "If a statute is ambiguous, the court, in determining
 the intention of the general assembly, may consider. . .
 [t]he consequences of a particular construction." §
 2-4-203(e). "[T]he best guide to intent is the
 declaration of policy which forms the initial part of an
 enactment." Walgreen Co. v. Charnes, 819 P.2d
 1039, 1044 (Colo. 1991). Where a particular construction of a
 statute would lead to a result contrary to the stated
 legislative intent, we have held that the legislature did not
 intend that construction. See, e.g.,
 id. at 1044-45 (concluding that where
 
 78
 
 the statutory language was ambiguous, the city at issue was
 not exempt from the statute because exemption would have
 frustrated the legislature's stated intent).
 
 
          ¶132
 Here, the CGMA declares that "nontributary groundwater
 shall be devoted to beneficial use in amounts based
 upon conservation of the resource and protection of vested
 water rights," and that to "continue the
 development of nontributary groundwater resources . . . shall
 be the policy of this state." § 37-90-102(2)
 (emphases added). Thus, with the CGMA, the General Assembly
 sought to balance its twin aims of economic development and
 conservative use of the groundwater resource. The legislature
 achieved this balance by regulating withdrawals to ensure a
 minimum aquifer life of 100 years. It is my position that the
 majority's interpretation of section 37-90-137(4), which
 cuts off nontributary water rights after 100 years of pumping
 at the allowed rate, frustrates this clearly stated
 legislative purpose.[3]
 
 
          ¶133
 If the majority's construction were to be implemented,
 the most obvious question is, "What happens next?"
 Understandably, the majority does not enter this terrain. But
 this question helps illuminate the issue before us. As I see
 it, there are two primary possibilities regarding what might
 occur after a permit expires.
 
 79
 
          ¶134
 The first is a true termination of the landowners' vested
 water rights, which appears to be the result the SEO
 advocates for. This option would cut off the landowners'
 water rights after the total volumetric cap is reached:
 "[O]nce a well's total volumetric limit is reached,
 the permittee must stop operating the well." Maj. op.
 ¶ 48. And because, as noted above, an unknown quantity
 of underlying water will likely remain after a landowner
 withdraws the SEO's estimated quantity, this rule would
 leave that remaining water stranded underground. There it
 would wait, until unspecified neighbors have pumped their own
 underlying water for 100 years. After that, the remaining
 water underlying each of the properties would sit stranded
 and unused.
 
 
          ¶135
 The second possibility is that landowners could apply for new
 permits to pump any remaining underlying water. Even though
 this option would allow the possibility of continued pumping,
 it would nonetheless inject a great degree of uncertainty
 into landowners' long-term water supplies.
 
 
          ¶136
 Neither the statutes, the rules, nor the legislative history
 say anything about these possible consequences. In fact, none
 of these sources say anything regarding how expired permits
 should be treated. There is no direct evidence that anyone,
 including the General Assembly or the SEO, much less water
 users, ever understood or intended that the possibilities
 outlined above would occur. That silence speaks volumes about
 what the legislature intended. If the General
 
 80
 
 Assembly meant to cap pumping after 100 years, it would have
 instructed both the SEO and water users that this was the
 case.
 
 
          ¶137
 And at the same time, the majority's construction would
 have severe and unexpected consequences for water users, like
 Parker, who require a stable water supply. Upon learning that
 their nontributary water rights will be terminated or called
 into question in as little as fifty years, these landowners
 would immediately need to reorient their long-term water
 supplies. Doing so would necessarily put greater pressure on
 the state's other surface and groundwater resources. It
 would also put significant and unexpected strain on these
 users' planning departments and budgets. And all the
 while, nontributary water would remain underlying their land,
 stranded and unused. A construction of the statute that leads
 to these consequences is contrary to the legislature's
 stated intention that "nontributary groundwater shall be
 devoted to beneficial use" and that "[t]o continue
 the development of nontributary groundwater resources . . .
 shall be the policy of this state." § 37-90-102(2).
 
 
          IV.
 Conclusion
 
 
          ¶138
 Nothing in the plain language of the statutes or rules
 provides for, much less requires, a total volumetric limit or
 related permit lifetime. Nonetheless, by declaring that the
 statute unambiguously requires a limit, the majority avoids
 consideration of both the legislative history and the
 consequences of its ruling.
 
 81
 
          
 ¶139 But the legislative history, like the text of the
 statute, is void of any mention of a volumetric cap. Thus, to
 accept the majority's interpretation requires concluding
 that in 1973, and again in 1985, the legislature voted to
 curtail water rights in Colorado without anybody
 raising their hand to ask a question or object.
 
 
          ¶140
 Further, the General Assembly explicitly declared that
 nontributary groundwater in Colorado is to be devoted to
 beneficial use and developed consonant with
 both conservation and the protection of vested
 water rights. But capping wells, as the majority's
 interpretation does, will leave water unused, putting
 additional pressure on the state's water resources,
 straining users' budgets, and abrogating landowners'
 vested rights. These consequences contravene the
 legislature's declared policy of balancing conservative
 water use with economic development.
 
 
          ¶141
 For the above reasons, I disagree with the majority's
 construction of section 37-90-137(4) deciding that the SEO
 has the authority to impose a TAW on nontributary wells
 statewide. If in the future the legislature changes its mind
 and wants these wells to cease pumping after 100 years, then
 it will use its plenary power over the state's
 nontributary water resources to direct the SEO accordingly.
 Thus, I respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We have direct appellate review
 jurisdiction over water adjudications pursuant to Colo.
 Const. art. VI, § 2(2), section 13-4-102(1)(d), C.R.S.
 (2024), and C.A.R. 1(a)(2). Parker raises the following six
 issues on appeal:
 
 
 1. Whether the Water Court erred in determining as a
 matter of law that the plain language of C.R.S. §
 37-90-137 unambiguously sets forth, requires and/or allows
 the State Engineer and the Division of Water Resources
 (collectively, the "SEO") to impose a total
 volumetric limit on the amount of nontributary groundwater
 that may be withdrawn pursuant to well permits issued
 pursuant to C.R.S. § 37-90-137(4).
 
 
 2. Whether the Water Court erred in determining as a
 matter of law that the Statewide Nontributary Groundwater
 Rules, 2 CCR 402-7 ("Rules") unambiguously set
 forth, impose and/or require a total volumetric limit on the
 amount of nontributary groundwater that may be withdrawn
 pursuant to well permits issued pursuant to C.R.S. §
 37-90-137(4).
 
 
 3. Whether the Water Court erred in determining as a
 matter of law that the SEO has authority under C.R.S. §
 37-90-137 to impose on well permits a total volumetric limit
 on the amount of nontributary groundwater that may be
 withdrawn where such limit is absent from and/or inconsistent
 with the terms of the underlying water court decrees.
 
 
 4. Whether the Water Court erred in determining as a
 matter of law that a total volumetric limit should be read
 into every water court decree and well permit where such
 decrees and permits only provide for an allowed average
 annual withdrawal (or its functional equivalent).
 
 
 5. Whether the Water Court erred in determining as a
 matter of law that the plain language of Senate Bill 213 (the
 prior version of C.R.S. § 37-90-137, in effect from 1973
 to 1985) unambiguously sets forth, requires and/or allows the
 SEO to impose a total volumetric limit on the amount of
 nontributary groundwater that may be withdrawn pursuant to
 well permits issued under Senate Bill 213.
 
 
 6. Whether the Water Court erred by staying all
 discovery and precluding the presentation of evidence,
 thereby making the determinations in the 2022 Order and 2023
 Order without affording the ability to conduct discovery or
 present evidence that would help establish and/or resolve any
 ambiguity in the statute or Rules.
 
 
 [2] An acre-foot is the amount of water
 needed to cover one acre of land with one foot of water. It
 is equivalent to 43,560 cubic feet or 325,851 gallons of
 water.
 
 
 [3] The United States Geological
 Survey's most recent data estimated that, by 2003, dry
 climactic conditions and continued well pumping in the Denver
 Basin had resulted in an annual depletion of approximately
 41,266 acre-feet of Denver Basin aquifer water per year. U.S.
 Geological Surv., supra, at xi. Estimated annual
 storage depletion increased exponentially beginning in 1999
 and was expected to continue increasing with population
 growth in the Denver metropolitan area. Id. at
 xi-xii.
 
 
 [4] This appeal concerns only nontributary
 groundwater in the Dawson, Denver, Arapahoe, and Laramie-Fox
 Hills aquifers that make up the Denver Basin.
 
 
 [5] Under the Groundwater Management Act,
 the legislature also classified some Denver Basin groundwater
 as "designated." § 37-90-103(6)(a). Designated
 groundwater is defined as that which, "in its natural
 course would not be available to and required for the
 fulfillment of decreed surface rights" or that is found
 "in areas not adjacent to a continuously flowing natural
 stream" where groundwater has historically
 "constituted the principal water usage." §
 37-90-103(6)(a). Designated groundwater is managed by the
 Colorado Ground Water Commission, which issues permits upon
 application. § 37-90-107(1), C.R.S. (2024). Because all
 of the groundwater at issue in this appeal is nondesignated,
 nontributary groundwater, the term "nontributary
 groundwater" throughout this opinion refers to
 nondesignated, nontributary groundwater unless otherwise
 indicated.
 
 
 [6] Not nontributary groundwater is unique
 to the Denver Basin. § 37-90-103(10.7) ("'Not
 nontributary groundwater' means groundwater located
 within those portions of the Dawson, Denver, Arapahoe, and
 Laramie-Fox Hills aquifers that are outside the boundaries of
 any designated groundwater basin. . . the withdrawal of which
 will, within one hundred years, deplete the flow of a natural
 stream . . . at an annual rate of greater than one-tenth of
 one percent of the annual rate of withdrawal."); N.
 Kiowa-Bijou, 77 P.3d at 73 n.21. This classification,
 while grammatically perplexing, is intentional. It reflects
 the General Assembly's recognition that because this
 water is hydrologically connected to a surface stream, it is
 not actually nontributary. N. Kiowa-Bijou, 77 P.3d
 at 73 n.21. The legislature opted, however, to administer
 this water separately from tributary water "in
 recognition of the de minimis amount of water discharging
 from the [Denver Basin] aquifers into surface streams . . .
 when compared with the great economic importance of the
 groundwater in those aquifers." §
 37-90-103(10.5).
 
 
 [7] Between the time the legislature
 enacted Senate Bill 213 and the printing of the 1973 Colorado
 Revised Statutes in 1974, section 148-18-36 was recodified as
 section 37-90-137. The laws enacted and amended in 1973 were
 not printed in a supplement to the 1963 Colorado Revised
 Statutes but were printed for the first time in 1974 using a
 new numbering system.
 
 
 [8] As a quasi-municipal special district
 that provides water services to landowners within its
 boundaries, Parker has the right to withdraw and use Denver
 Basin groundwater underlying Parker's boundaries pursuant
 to section 37-90-137(8), which provides, in part:
 
 
 [W]herever any existing municipal or quasi-municipal
 water supplier is obligated either by law or by contract in
 effect... to be the principal provider of public water
 service to landowners within a certain municipal or
 quasi-municipal boundary ..., said water supplier may adopt
 an ordinance or resolution. . . which incorporates
 groundwater from [the Denver Basin aquifers] underlying all
 or any specified portion of such municipality's or
 quasi-municipality's boundary into its actual municipal
 service plan. . . . Upon the effective date of such ordinance
 or resolution, the owners of land which overlies such
 groundwater shall be deemed to have consented to the
 withdrawal by that water supplier of all such groundwater
 ....
 
 
 [9] We note that even if we were to look
 at legislative history, the bill's proponents
 acknowledged from the very first hearings on Senate Bill 213
 that the State Engineer was being inundated with permit
 applications to mine the Denver Basin aquifers from housing
 developments along the southern front range, and that the
 mining of nontributary groundwater would be a finite
 operation that would only serve the developments that relied
 on it for a relatively short period of time. "All of the
 residential development in the Parker-Franktown-Castle Rock
 area taps into these supplies," said Harlan Erker, the
 chief engineer in charge of groundwater operations in the
 Division of Water Resources at a meeting of the Senate
 Committee on Agriculture Livestock and Natural Resources on
 March 7, 1973. "Another area where people are really,
 where it's really hot is in the Parker area. They're
 requesting permits out there in the Denver Basin for new
 subdivisions," said Don Hamburg, an attorney for the
 State Engineer at a March 5, 1973 meeting of that same
 committee. "The way the applications are coming in in
 the Monument, Colorado Springs area, the way the applications
 have come in they can drain that aquifer in a relatively
 short period of time if we were to grant them all," said
 Hamburg. The statutory scheme enacted by the legislature was
 a way of ensuring that every landowner got their fair share
 -but no more -and stretched the life of the aquifers out to
 at least 100 years. But the rapid depletion of the Denver
 Basin aquifers, the impact of that depletion on these
 developments, and the need to avoid a race to the bottom of
 the aquifers were all looming problems that were widely
 discussed by those involved in crafting this
 legislation.
 
 
 [1] In the interest of brevity, I omit a
 thorough review of the technical aspects of the rules.
 However, nothing in the plain language of the rules, beyond
 the discussed portions of Rule 8, seems to support the
 majority's construction. Indeed, the majority cites no
 other portions of the rules in support of its
 position.
 
 
 [2] Although my discussion of the
 legislative history has admittedly been lengthy, I have
 omitted many citations in the interest of brevity. A thorough
 review of the legislative history, including the portion
 cited by the majority in its Footnote 9, reveals no mention
 of a total volumetric cap, permit lifetime, or anything of
 the sort.
 
 
 [3] As the majority notes in its Footnote
 4, this appeal only concerns the Denver Basin aquifers. I
 agree. The statutes and rules at issue, however, apply
 statewide.
 
 
 ---------